716 F.2d 675
 4 Employee Benefits Ca 2321
 Donald W. LOJEK, Plaintiff-Appellant,
v.
Eugene C. THOMAS, J. Charles Blanton, Moffatt, Thomas,
Barrett & Blanton, Chartered, and Moffatt, Thomas, Barrett &
Blanton, Chartered, Profit Sharing Plan and The Idaho First
National Bank, Trustee, Defendants-Appellees.
 No. 82-3682.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 7, 1983.
Decided Sept. 22, 1983.
 
 Donald W. Lojek, Parkinson, Lojek & Penland, Chtd., Boise, Idaho, for plaintiff-appellant.
 Phillip M. Barber, Hawley, Troxell, Ennis & Hawley, Boise, Idaho, for defendants-appellees.
 Appeal from the United States District Court for the District of Idaho.
 Before WRIGHT, CHOY and NELSON, Circuit Judges.
 NELSON, Circuit Judge:
 
 
 1
 Donald W. Lojek (Lojek) appeals from the district court's partial summary judgment for appellees Moffatt, Thomas, Barrett & Blanton, Chartered (MTBB) in an action challenging the forfeiture of his pension benefits. Lojek also appeals the dismissal of his complaint on the ground that he was not constructively discharged.[1] We affirm.
 
 FACTS
 
 2
 Lojek, an attorney, joined MTBB, a Boise, Idaho law firm in March 1972. In January 1972, MTBB adopted a profit sharing and retirement plan (the plan).[2] The plan was revised in August 1976 in accordance with the requirements of the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Sec. 1001 et seq. (1976) to provide that 100% of retirement benefits would vest and be non-forfeitable after ten years of employment. If, however, an attorney voluntarily leaves the firm before completing ten years of employment, engages in competitive employment within two years after leaving the firm, and within a five county area, the attorney forfeits all retirement benefits.[3] The Internal Revenue Service approved the 1976 plan as a tax-qualified employee benefit plan.
 
 
 3
 Lojek became an MTBB's shareholder in April 1976.[4] In 1978, Lojek became dissatisfied with proposed changes in the share purchase agreement whereby the purchase of shares by junior shareholders would depend on an attorney's performance as determined by a review committee. He disapproved of the proposed agreement that senior partners reduce their stockholdings and that one senior partner, Thomas, be allowed to transfer five shares to his son. Lojek also objected to the method chosen for the valuation of the shares.
 
 
 4
 The majority of shareholders accepted the proposed changes and rejected Lojek's proposal that junior shareholders be guaranteed the right to purchase a number of shares regardless of merit. Lojek refused to sign the new stock purchase and redemption agreement as well as the stockholders' agreement and left the firm on August 1, 1978 because he was dissatisfied with the content of the agreements.
 
 
 5
 In the fall of 1978, Lojek began practicing law in Ada County, Idaho. MTBB's plan administrator declared a forfeiture of Lojek's profit-sharing and retirement benefits in accordance with Sec. 5.12 of the plan. No part of those benefits consisted of employee contributions because Lojek had not made any voluntary contributions to his plan account. The amount forfeited was approximately $25,000, all attributable to employer contributions, plan earnings, and unrealized gains on plan assets.
 
 
 6
 COMPLETED YEARS PERCENTAGE
 OF SERVICE OF VESTING
one 0%
two 20%
three 60%
four 80%
five 100%
 
 
 7
 Lojek sued MTBB in federal district court, arguing that Sec. 5.12 of the plan and the forfeiture of his benefits violated ERISA guarantees against forfeitures. The trial court granted partial summary judgment for MTBB on the following issues:
 
 
 8
 (1) ERISA preempted state law on vesting and forfeiture of pension plan rights;
 
 
 9
 (2) The MTBB plan was authorized under ERISA (29 U.S.C. Sec. 1053(a)(2)(A));
 
 
 10
 (3) Anti-competition clauses permitting forfeiture are valid under ERISA;
 
 
 11
 (4) Lojek had not completed ten years of employment before leaving the firm, and thus his benefits were subject to forfeiture if he competed with MTBB.
 
 
 12
 The parties then tried the remaining issue, whether Lojek "voluntarily terminated his employment or was constructively discharged." After a bench trial, the district court concluded that Lojek was neither constructively discharged nor forced to resign, and thus, forfeiture of his account under the plan was legal. Lojek appeals both the summary judgment and the judgment after trial.
 
 STANDARD OF REVIEW
 
 13
 Summary judgment is appropriate if, viewing the evidence in the light most favorable to the opposing party, the trial court finds "that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We review de novo the trial court's grant of summary judgment. Wood v. Santa Barbara Chamber of Commerce Inc., 705 F.2d 1515, 1519 (9th Cir.1983).ISSUES PRESENTED
 
 
 14
 I. Is the competition/forfeiture provision of the MTBB plan valid under ERISA?
 
 
 15
 II. Did the district court clearly err in finding that Lojek voluntarily left his employment?
 
 DISCUSSION
 
 16
 I. Validity of the Competition/Forfeiture Provisions of the Plan Under ERISA
 
 
 17
 A. ERISA Provisions Preempt State Law.
 
 
 18
 Lojek contends that ERISA was intended to prevent loss or forfeiture of employee benefits and therefore, even if the MTBB plan is valid under ERISA, ERISA provisions should not govern the result of this case. Instead, Lojek argues that Idaho common law on anti-competition clauses should control. Lojek's argument must fail.
 
 
 19
 It is true that "[o]ne of the primary purposes of the Act is to insure that plan participants do not lose vested benefits because of 'unduly restrictive' forfeiture provisions," Hummell v. S.E. Rykoff & Co., 634 F.2d 446, 448 (9th Cir.1980). It is also true, however, that Congress explicitly provided that ERISA's provisions preempt state laws. Section 514 provides in pertinent part: "[ERISA] ... shall supercede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. Sec. 1144 (1976). This provision became effective on January 1, 1975, 29 U.S.C. Sec. 1144(b)(1), and clearly controls here. See Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981); Smith v. CMTA-IAM Pension Trust, 654 F.2d 650, 660 n. 14 (9th Cir.1981). The district court correctly decided that ERISA has preempted Idaho law and that federal law governs the validity of the plan.
 
 B. MTBB Plan Complies with ERISA
 1. MTBB Plan
 
 20
 Section 1053(a)(2) of ERISA provides that an employee benefit plan meets the requirements of ERISA if it satisfies one of three "alternative" minimum vesting standards. Hummell v. S.E. Rykoff & Co., 634 F.2d at 450.[5] The first standard provides that an employee must have a nonforfeitable right to 100% of his accrued benefits derived from employee contributions after ten years of employment. 29 U.S.C. Sec. 1053(a)(2)(A).[6] There is no requirement for vesting of any lesser percentage of benefits before the required ten years of service.
 
 
 21
 The MTBB plan provides a vesting schedule more liberal than the minimum ERISA requirements because an employee's benefits become 100% vested after five years of service. Although the vesting schedule of Sec. 5.1 is subject to the non-competition forfeiture provisions of Sec. 5.12, this section provides, in accordance with ERISA Sec. 1053(a)(2)(A), that no benefits are forfeitable after ten years of service, regardless of entrance into competitive employment by an employee. Thus, the MTBB plan meets the requirements of Sec. 1053(a)(2)(A) because it does not affect any nonforfeitable interests.[7] Hummel, 634 F.2d at 450. The district court correctly found that the MTBB plan was authorized pursuant to 29 U.S.C. Sec. 1053(a)(2)(A).
 
 
 22
 2. Validity of the Anticompetition/Forfeiture Clause
 
 
 23
 Lojek argues unpersuasively that the MTBB anticompetition clause is invalid under ERISA because ERISA's aim is to protect the interest of employees, and the clause is too broad.
 
 
 24
 Although one of ERISA's primary purposes is to ensure that employees do not lose vested benefits because of unduly restrictive forfeiture provisions, we held recently that ERISA does not prohibit forfeiture of benefits in excess of ERISA's minimum vesting requirements. Hummell v. S.E. Rykoff & Co., 634 F.2d 446, 450 (9th Cir.1980).[8] Hummell relied on an applicable Treasury Regulation and cases from other circuits, to hold that where, as here, a plan complies with one of the three Sec. 1053(a)(2) plan options, ERISA does not prohibit forfeiture of non-vested benefits in excess of the minimum vesting requirements in Sec. 1053. Id. at 449-51 (citing 26 C.F.R. Sec. 1.411(a)-4; Hepple v. Roberts & Dybdahl, 622 F.2d 962 (8th Cir.1980); Fremont v. McGraw-Edison Co., 606 F.2d 752 (7th Cir.1979), cert. denied, 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980)).
 
 
 25
 In Fremont, the profit-sharing plan contained a forfeiture clause providing that an employee with less than ten years of service who stole company property forfeited his accrued benefits. 606 F.2d at 759 n. 11. The employee, who stole company property, had been with the company for six years. Because the plan's vesting schedule complied with the ten year 100% option in Sec. 1053(a)(2)(A), the forfeiture provision did not violate ERISA because it did not "affect any nonforfeitable interests." Id. at 760.
 
 
 26
 The plan in Hepple provided for forfeiture of employer contributions for employees with less than ten years of service who later competed with the employer. 622 F.2d at 963. The employee left his employment after six years and went to work for a competitor. Because the vesting schedule met with the requirements of Sec. 1053(a)(2)(A), the court held that the benefits were forfeitable.
 
 
 27
 Similarly to MTBB's plan, the Hummell plan provided for forfeiture if an employee became a business competitor within two years after leaving his employment. In the Hummell plan, an employee with less than fifteen years of service who became a business competitor forfeited a percentage of benefits determined by the number of years of service. 634 F.2d at 448. Those with fifteen years or more service were fully vested, despite any competitive activity. A different vesting schedule, however, applied to benefits of employees with less than fifteen years service who terminated their employment, but did not compete. Their interests were 100% vested after ten years. Id.
 
 
 28
 We held that the company could not apply a fifteen-year graded vesting schedule to employees who violated the anticompetition clause and the ten year 100% vesting schedule to all other employees. Thus, the employee who went to work for a competitor after eleven years of service was not subject to the anticompetition forfeiture provision, but was 100% vested in his benefits. Id. at 450-452.
 
 
 29
 To some extent, the plan in the present case provides two different vesting schedules. Plan Sec. 5.1 provides for progressive vesting up to 100% after five years. Section 5.12, however, provides that competitors forfeit 100% of benefits if they leave their employment and compete within two years before completing ten years of service.
 
 
 30
 Although the employer in this case provides what may be considered a different vesting schedule for competitors than for other employees, both are valid under Sec. 1053(a)(2), and the "composite arrangement" satisfies all requirements of one vesting option (i.e. Sec. 1053(a)(2)(A)) for all of Lojek's years of service. See Hummel, 634 F.2d at 451-52. The trial court correctly ruled that the forfeiture provision of the MTBB plan is valid.[9]
 
 II. Voluntary Termination of Employment
 
 31
 Our holding that the post-employment competition forfeiture provision of the MTBB's plan is not invalid does not dispose of the case. The question remains whether Lojek voluntarily terminated his employment or was constructively discharged. If Lojek arbitrarily was forced to resign, the forfeiture provision would be inapplicable to him.
 
 A. Standard of Review
 
 32
 The district court's factual determinations are reversible by this court only if they are clearly erroneous. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); Fluor Corp. v. United States ex rel. Mosher Steel Co., 405 F.2d 823, 825 (9th Cir.), cert. denied, 394 U.S. 1014, 89 S.Ct. 1632, 23 L.Ed.2d 40 (1969); Fed.R.Civ.P. 52(a).
 
 B. Constructive Discharge
 
 33
 Lojek contends that he left MTBB for "compelling reasons" and because of a "fundamental change in his employment contract." He refers to the change in the stock purchase and redemption agreement and to reduction of stockholdings by senior partners in MTBB, one of whom would transfer five of his shares to his son if the son joined MTBB as an attorney.
 
 
 34
 The district court found that although Lojek left his employment with MTBB because he was dissatisfied with these changes, he left voluntarily and was not constructively discharged. We agree.
 
 
 35
 The issue of what constitutes constructive discharge in the context of a pension plan governed by the provisions of ERISA apparently is an issue of first impression in this circuit.[10] ERISA's legislative history, however, reveals that Congress was concerned with the acts of unscrupulous employers who discharged and harassed their employees in order to keep them from obtaining vested pension rights. Senator Hartke, speaking in support of sanctions[11] for interference with protected rights made it clear:Most collective bargaining agreements protect employees against discharge without good cause and provide effective enforcement machinery in arbitration proceedings whose results are enforceable under section 301 of the Labor-Management Relations Act. But roughly half of all pension participants are not unionized and so they lack protection. Especially vulnerable are managers and executives whose substantial pension potentialities provide an incentive to their discharge before vesting. The managers of the bill ought to think twice too. Discipline and discrimination can be so unpleasant as to amount to constructive discharge, a term used by the National Labor Relations Board. That can be the type of harassment which does not say that one is fired, but makes living such a hell that a person wishes he did not have to hang on and endure.
 
 
 36
 In recognition of that problem, section 610 of S. 4 as originally reported--made it illegal to "discharge, fine, suspend, expell [sic], discipline or discriminate" against plan participants to defeat rights under the act or a plan. The language parallels section 8(a)(3) of the National Labor Relations Act and should do the trick--but only if an adequate enforcement machinery exists.
 
 
 37
 119 Cong.Rec. 30374, reprinted in Subcomm. on Labor, the Senate Comm. on Labor and Public Welfare, Legislative History of the Employer Retirement Income Security Act of 1974, Pub.L. No. 93-406 (Comm. Print 1976) at 1774-75. [hereinafter cited as Legislative History] (emphasis added).[12]
 
 
 38
 As Senator Hartke's reference indicates, the doctrine of constructive discharge had its origin in the labor relations area, e.g., J.P. Stevens & Co. v. N.L.R.B., 461 F.2d 490, 494 (4th Cir.1972); N.L.R.B. v. Century Broadcasting, 419 F.2d 771, (8th Cir.1969); N.L.R.B. v. Tennessee Packers, Inc., Frosty Man. Div., 339 F.2d 203 (6th Cir.1964), but has been extended and held applicable to civil rights claims. E.g., Noland v. Cleland, 686 F.2d 806, 814 & n. 17 (9th Cir.1982) (sex-based discrimination); Sutton v. Atlantic Richfield Co., 646 F.2d 407, 411 n. 5 (9th Cir.1981) (age discrimination); Welch v. University of Texas & Its Marine Science Institute, 659 F.2d 531, 533 (5th Cir.1981) (sex discrimination); Muller v. United States Steel Corp., 509 F.2d 923, 929 (10th Cir.), cert. denied, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975) (ethnic discrimination). Similarly, we believe ERISA's legislative history and section 510 clearly indicate that the doctrine of constructive discharge is applicable to cases where, as here, the employee resigns, engages in competitive employment, and as a result forfeits his pension benefits.
 
 
 39
 In Noland v. Cleland, 686 F.2d 806, 813-14 (9th Cir.1982), we adopted the Fifth Circuit's formulation of constructive discharge first enunciated in Young v. Southwestern Savings & Loan Association, 509 F.2d 140, 144 (5th Cir.1975) and later clarified in Bourque v. Powell Electrical Manufacturing Co., 617 F.2d 61, 65 (5th Cir.1980). Under this objective standard, "constructive discharge exists when 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " Noland, 686 F.2d at 813, quoting Bourque at 65. See also Meyer v. Brown & Root Construction Co., 661 F.2d 369, 372 (5th Cir.1981); Welch v. University of Texas, 659 F.2d 531, 533 (5th Cir.1981); Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir.1977).[13]
 
 
 40
 Lojek argues that one of the changes that materially changed his contract of employment, and forced him to resign, was the increase in the price of MTBB's shares. He contends that prior to the new stock purchase agreement, the shares were valued at $2000 each, but increased in price six or seven times when the senior shareholders began to dispose of some of their shares. Lojek, however, testified that the first two shares he acquired had a fixed price of $3,500 each, that he paid $4,000 for the second share, and that he did not know how the shares were valued at the time he bought them. Lojek testified further that at least one member of the firm informed him that the price Lojek paid for his first two shares was a bargain. It is not unexpected for stock to increase in value over time. In fact, most people buy stock with precisely that expectation. More important, the agreements did not compel Lojek to buy a certain number of shares at the higher price. We agree with the district court that the stock valuation method adopted by the majority of the stockholders was reasonable, practical, and fair to all stockholders.
 
 
 41
 Next, Lojek contends that the agreements were inequitable and uncertain because only the son of the senior partner was given a timetable for acquiring an equity interest in the firm. Yet, it is undisputed that when Lojek became a shareholder there was a tremendous imbalance of equity ownership in the firm. The three senior shareholders, Thomas, Blanton, and Barrett, owned a large percentage of the total shares and "were then reaching the benefits of a very good and healthy cash flow." In addition, their shares were unrestricted and, at least in theory, could have been transferred to any qualified lawyer who practiced law in Idaho. There was also concern and confusion as to how the other members of the firm would reach some "parity" with the three senior shareholders.
 
 
 42
 The agreements were the product of negotiations to correct the imbalance in the firm. Several proposals were presented for the shareholders' consideration and Lojek actively participated in these discussions. The majority of stockholders rejected Lojek's proposal that junior members be guaranteed the right to purchase the maximum number of shares over a term of years. Instead, they adopted a merit system whereby the junior stockholders would be given the opportunity to purchase stock according to the recommendation of a review committee. A key provision in the new stock agreement was the senior stockholders' commitment to reduce their stocks over a period of six years to 15 shares each. Contrary to Lojek's contention, this arrangement is neither unfair nor inequitable.
 
 
 43
 Similarly, we do not believe that the transfer of five shares from Thomas to his son is illegal or unethical. Although the arrangement may appear unfair at first glance, it is clear from the record that the arrangement was a compromise whereby Thomas, and the other two senior partners, would relinquish a substantial amount of voting power and equity ownership if Thomas could transfer five of his shares to his son.[14] The arrangement is not unreasonable, particularly in light of the safeguards built into the agreement.
 
 
 44
 The transfer would occur over a period of three years. The first transfer would take place only after Thomas' son had practiced law for at least three years, and had been a member of the firm for at least one year. In short, it would be a total of five years before young Thomas had five shares. In addition, each transfer was subject to disapproval by the holders of 60% of the corporation's outstanding shares. We believe these safeguards were sufficient to protect the other members of the firm. The trial court did not err by finding that the arrangement to transfer Thomas' shares to his son did not differ materially from the opportunity to purchase shares which was afforded by the agreement to other junior members of the firm,[15] and that the stock valuation method adopted by the majority of the stockholders was reasonable, practical, and fair to all stockholders.
 
 
 45
 All the stockholders except Lojek signed the stock purchase and redemption agreement and the stockholders agreement. The changes reflected in the agreements were by and large more favorable to junior members of the firm than the situation had been in the past. By their terms, the agreements were not binding on Lojek if he did not sign them, and there is no evidence that he was being forced to sign or leave the firm. Lojek's working conditions were not so unpleasant that a reasonable person in Lojek's shoes would have been compelled to resign three years before his pension benefits fully vested under ERISA. Mere disagreement with the agreements does not constitute constructive discharge. The district court's finding that Lojek was neither subjected to intolerable employment conditions nor was he coerced to resign is not clearly erroneous.
 
 Attorneys Fees
 
 46
 MTBB characterizes this appeal as frivolous and requests attorney's fees. The issues presented in this case do not compel such characterization. Therefore, MTBB is not entitled to an award of attorney's fees. See Dosier v. Miami Valley Broadcasting Corp., 656 F.2d 1295, 1301 (9th Cir.1981), Russell v. Price, 612 F.2d 1123, 1132 (9th Cir.1979), cert. denied, 446 U.S. 952, 100 S.Ct. 2919, 64 L.Ed.2d 809 (1980).
 
 
 47
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 The partial summary judgment did not dispose of all claims and was not certified under Fed.R.Civ.P. 54(b). Therefore, it was not a final order and could not be appealed until the judgment after trial disposed of the remaining claim. Although the district court dismissed the complaint instead of the action, the order is appealable because the complaint was dismissed with prejudice. See Scott v. Eversole Mortuary, 522 F.2d 1110, 1112 (9th Cir.1975)
 
 
 [2]
 The relevant portion of the 1972 plan provided:
 
 
 [5]
 6 If a Participant voluntarily discontinues employment with the Company and enters competitive employment either as an attorney practicing alone or with others or as an employee of any attorney or law firm in Gem, Boise, Canyon, Elmore or Ada County, Idaho, within two (2) years following such separation from the company, such Participant shall thereby forfeit his entire interest in the Fund, whether forfeitable or non-forfeitable
 
 
 [3]
 The relevant portions of the revised 1976 plan provides:
 
 
 [5]
 1 A Participant's proportionate interest in the Employer Contributions to the Fund shall vest and become non-forfeitable pursuant to the following, subject to other provisions of this Article V
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 A Participant's voluntary contributions to the Fund shall always be 100% vested and nonforfeitable and may be withdrawn by Participant upon written directions to the Trustee.
 ....
 
 
 [5]
 12 Notwithstanding the other provisions hereof, if a Participant voluntarily discontinues employment with the Company prior to receiving credit for ten (10) years of service, and enters competitive employment either as an attorney practicing alone or with others, or as an employee of any attorney or law firm in Gem, Boise, Canyon, Elmore or Ada County, Idaho, within two (2) years following such separation from the Company, such Participant shall forfeit his entire interest in the Fund, whether or not vested. This Section 5.12 shall not apply to any Participant who has completed ten (10) years of service
 
 
 [4]
 The equivalent of partnership in the law firm
 
 
 [5]
 See H.Rep. No. 93-533, 93d Cong., 2d Sess. reprinted in [1974] U.S.Code Cong. & Ad.News 4661; H.Rep. No. 93-807, 93d Cong., 2d Sess., reprinted in [1974] U.S.Code Cong. & Ad.News 4720; H.Conf.Rep. No. 95-1280, 93d Cong., 2d Sess., reprinted in [1974] U.S.Code Cong. & Ad.News 5050
 The three minimum vesting tests also are contained in section 411 of the Internal Revenue Code.
 
 
 [6]
 Section 1053(a) provides:
 Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age and in addition shall satisfy the requirements of paragraphs (1) and (2) of this subsection.
 (1) A plan satisfies the requirements of this paragraph if an employee's rights in his accrued benefit derived from his own contributions are nonforfeitable.
 (2) A plan satisfies the requirements of this paragraph if it satisfies the requirements of subparagraph (A), (B), or (C).
 (A) A plan satisfies the requirements of this subparagraph if an employee who has at least 10 years of service has a nonforfeitable right to 100 percent of his accrued benefit derived from employer contributions.
 The other two tests, not at issue here, provide that an increasing percentage of benefits shall become nonforfeitable after an increasing number of years of service.
 
 
 [7]
 Lojek's reliance on Duchow v. New York State Teamster's Conf. Pension & Retirement Fund, 691 F.2d 74 (2d Cir.1982) is unfounded. There the court held that under ERISA an employee's pension benefits must vest, irrespective of length of service, either on the employee's 65th birthday or on the tenth anniversary of his joining the plan, whichever occurs later, unless the plan itself allows earlier vesting. Lojek was at most 38 years old at the time of his resignation. Thus, there is no issue before this court regarding vesting of benefits at 65
 
 
 [8]
 Permitted forfeitures of accrued benefits from employer contributions are contained in Sec. 1053(a)(3)(A)-(E). It does not include anti-competition forfeiture provisions or refer to the forfeitability of benefits which exceed the minimum vesting requirements in Sec. 1053(a)(2)(A)-(C)
 
 
 [9]
 Lojek also argues that even if forfeiture clauses generally may be valid under ERISA, the clause in the present case should be considered too broad. This argument is unpersuasive. The anticompetition forfeiture clause is identical in duration of time (i.e., two years) to that in Hummell and narrower in geographical area (i.e., five counties as compared to an apparently unlimited area in Hummell )
 
 
 [10]
 Our research has produced only one district court case where constructive discharge was considered in an action for severance benefits under section 502(a)(1)(B) of ERISA. Donnelly v. Aetna Life Insurance Co., 465 F.Supp. 696, 698 (E.D.Pa.1979) (plaintiff's allegations that her resignation was involuntary, and therefore a constructive discharge, were not supported by the evidence); cf. Dependahl v. Falstaff Brewing Corp., 491 F.Supp. 1188, 1196 (E.D.Mo.1980), rev'd in part on other grounds 653 F.2d 1208, 1214 (8th Cir.), cert. denied, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981) (corporation's benefit plan for survivors of selected executives and severance pay plan were valid, binding and enforceable employee welfare benefit plans under ERISA)
 
 
 [11]
 Section 510 of the Act prohibits interference with protected rights, 29 U.S.C. Sec. 1140 (1976) and Sec. 511 provides criminal penalties where that interference is coercive. 29 U.S.C. Sec. 1141 (1976)
 
 
 [12]
 Senator Javits also explained that Sec. 510 would prevent an employer from arbitrarily discharging an employee whose pension rights are about to vest. 119 Cong.Rec. 30044, reprinted in Legislative History at 1641. For an extensive discussion of the legislative history of Secs. 510 and 511, see West v. Butler, 621 F.2d 240, 242-45 (6th Cir.1980)
 
 
 [13]
 Noland implicitly rejected the Eighth and Tenth Circuits' subjective standard which requires proof of the employer's intent to force the employee to resign. See, e.g., Johnson v. Bunny Bread Co., 646 F.2d 1250, 1256 (8th Cir.1981); Muller v. United States Steel Corp., 509 F.2d 923, 929 (10th Cir.), cert. denied, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975)
 
 
 [14]
 The son at this time had just been graduated from Columbia Law School and was an associate at a major New York firm
 
 
 [15]
 The record indicates that shares of stock were offered to junior attorneys for purchase at different rates on an assessment of their performance, capabilities, and potential. One of the members of the firm testified at trial that he was offered the opportunity to purchase two shares of stock after only his first year with the firm