The **BOARD OF TRUSTEES OF THE WATSONVILLE FROZEN FOOD WELFARE TRUST FUND** and The Watsonville Frozen Food Welfare Trust Fund, Plaintiffs–Appellees,

v.

**CALIFORNIA COOPERATIVE CREAMERY**, a corporation, Michael E. Nash, individually and as president of California Cooperative Creamery, Defendant–Appellant.

No. 87–2931.

United States Court of Appeals, Ninth Circuit.

Argued Dec. 14, 1988.

Submitted Dec. 22, 1988.

Decided June 21, 1989.

---

**1418**

Wesley Sizoo and Eric O. Nieman, Moore, Sizoo & Cantwell, Walnut Creek, Cal., for defendant-appellant.

W. George Wailes and Sandra K. Rogers, Williams, Kelly, Polverari & Skelton, San Mateo, Cal., for plaintiffs-appellees.

Before CHOY, CANBY and NORRIS, Circuit Judges.

CHOY, Circuit Judge:

California Cooperative Creamery ("Cal Co-op") appeals from a judgment in favor of the Watsonville Frozen Food Welfare Trust Fund (the "Trust Fund") and its Board of Trustees (the "Board"). The Board brought this action under section 502 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132, and section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, to collect contributions the Board determined Cal Co-op owed to the Trust Fund. Cal Co-op is a California corporation engaged in the milk and cheese business. The Trust Fund is a multiemployer health and welfare trust organized under ERISA and the LMRA. The Trust Fund operates pursuant to a Trust Agreement.

Cal Co-op entered into a series of collective bargaining agreements ("CBAs") with the General Truck Drivers, Warehousemen & Helpers Union Local No. 624 ("Local 624"). From 1976 until 1984, the CBAs required Cal Co-op to make contributions to the Trust Fund on behalf of Cal Co-op's employees for health and welfare coverage. In compliance with this obligation, Cal Co-op entered into a Subscriber Agreement with the Trust Fund, which required that Cal Co-op comply with the terms of the Trust Agreement. The CBA dated April 1, 1984 ("1984 CBA"), required continued contributions for employee benefits, but allowed Cal Co-op to replace the Trust Fund with a health and welfare program of Cal Co-op's choice, as long as the same level of benefits was maintained.

The Trust Fund ordinarily maintained a reserve of funds to cover incurred but unreported claims[1] by employees. In the 1983–1984 plan year, however, claims by beneficiaries of the Trust Fund exceeded premiums paid by contributing employers. As a result of this adverse claims experience, the reserve funds were exhausted. In September, 1984, Transamerica Occidental Life Insurance Company ("Transamerica"), the carrier for the Trust Fund, notified the Board that it would increase rates substantially because of the excess between claims and premiums paid. Transamerica agreed to reduce the proposed rate increases if the Trust Fund established a new reserve to cover incurred but unreported claims.

On October 4, 1984, the Board met and voted to increase contribution rates for employers. The Board also voted to assess a termination premium on any employer who withdrew from the Trust Fund. The Board decided to impose the termination premium because it was concerned that the contribution rate increases might cause many employers to withdraw from the Trust Fund before the Trust Fund could reestablish adequate reserves to pay incurred but unreported claims. The Board notified each participating employer of the adoption of the termination premium on October 9, 1984.

On June 3, 1985, Cal Co-op notified the Trust Fund that Cal Co-op would be exercising its right under the 1984 CBA to

---

1. Incurred but unreported claims result from the lag time between the date on which a medical provider provides services to a beneficiary and the date on which payment for those services is reflected in the Trust Fund's books and records. The lag time can be several months because of the numerous steps involved in processing claims and because beneficiaries often fail to submit claims promptly.

withdraw from the Trust Fund. The Board informed Cal Co-op that the company was liable for a termination premium of $88,-000. On July 10, 1985, Cal Co-op advised the Board that Cal Co-op would not pay the termination premium.

The CBAs require contributions to the Trust Fund for all "eligible employees." On November 27, 1985, the Trust Fund conducted an audit of Cal Co-op for the period from January 1, 1982, through July 1, 1985. The audit revealed that Cal Co-op had failed to report or make contributions for 21 summer employees who had worked 80 hours per month in the previous months. In April, 1986, Cal Co-op paid the principal owed for 5 of the 21 employees but did not pay any interest, liquidated damages, attorney's fees, or costs. The remaining 16 employees were dependents of other Cal Co-op employees. Cal Co-op refused to make contributions for these 16 employees, arguing that they were excluded from the definition of eligible employees because they already received coverage as dependents and further coverage only would be duplicative.

On January 26, 1986, the Board filed a complaint in federal district court. The first and second causes of action alleged breach of the CBAs and ERISA violations because of the failure to make contributions for the 21 summer employees. The third, fourth, and fifth causes of action were for fraud, misrepresentation, and failure to disclose in connection with Cal Co-op's reports regarding the number of eligible employees. The sixth cause of action alleged breach of the CBAs as a result of the failure to pay the assessed termination premium.

On May 30, 1986, the Board filed a motion for summary judgment on the first, second, and sixth causes of action. With regard to the sixth cause of action, the Board argued that it had the power to impose a termination premium and that it had not breached its fiduciary duties under ERISA in assessing the premium. Cal Co-op also moved for summary judgment on this cause of action, arguing that the Board had no authority to assess a termination

premium and that imposition of the premium did result from a breach of the Board's fiduciary duties.

On June 26, 1986, the district court granted the Board's motion for summary judgment on the sixth cause of action and denied Cal Co-op's motion. The court awarded attorney's fees, interest, liquidated damages, and costs to the Trust Fund. Judgment was entered as to the sixth cause of action on September 9, 1986.

At the hearing on June 26, 1986, the court denied the Board's motion for summary judgment with regard to the first and second causes of action and set the matter for trial. On October 1, 1987, the district court issued a memorandum opinion with regard to the remaining causes of action. The district court found that Cal Co-op was legally obligated to remit health and welfare contributions to the Trust Fund on behalf of the dependent summer employees. Judgment was entered on October 2, 1987, and Cal Co-op timely appealed.

## DISCUSSION

### I. *Propriety of Imposing the Termination Premium*

Cal Co-op's first argument on appeal is that the district court erred in granting the Trust Fund's motion for summary judgment on the sixth cause of action because it was improper for the Board to impose a termination premium. This court reviews the grant of summary judgment de novo. *Lojek v. Thomas,* 716 F.2d 675, 677 (9th Cir.1983). Summary judgment is proper if, viewing the evidence most favorably to the opponent of the motion, the court finds that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.* To uphold summary judgment in this case, we must determine whether the termination premium was authorized by the Trust Agreement and whether the Board breached any duty owed to Cal Co-op when the Board imposed the premium.

### A. Contractual Authority for the Termination Premium

■ Congress intended that the common law of trusts would define the general

scope of trustee authority and responsibility for welfare and pension funds regulated under ERISA. *Central States Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 570, 105 S.Ct. 2833, 2840, 86 L.Ed.2d 447 (1985). Under traditional trust law, the scope of trustee authority and responsibility is defined and limited by the trust agreement. *Sinai Hosp. of Baltimore v. National Benefit Fund for Hosp. & Health Care Employees*, 697 F.2d 562, 568 (4th Cir.1982); 2 A. Scott, *Law of Trusts* § 164 (3d ed. 1967). Thus, we look to the Trust Agreement and the documents incorporated by reference therein[2] to determine whether the Board was authorized to collect the premium. Because the district court's decision is before us on summary judgment, our review of its decision is de novo. *Lojek*, 716 F.2d at 677.

■ Special rules of contractual interpretation apply in cases involving the administration of an employee benefit trust agreement. In these cases, courts must defer to the trustees' interpretation of a trust agreement unless the interpretation is arbitrary, capricious, or contrary to law. *Smith v. CMTAIAM Pension Trust*, 654 F.2d 650, 654 (9th Cir.1981). This is especially true when, as here, the trust agreement gives the trustees broad discretion. *Id.* at 655. In the present case, the Board has broad discretion since the Trust Agreement gives the Board the power to construe any of the terms or provisions of the Agreement and makes this construction binding on all persons concerned. Thus, if the Board's interpretation of the Agreement is reasonable, we must defer to that interpretation.

■ Section IX–E of the Trust Agreement provides that the Board may establish regulations to protect the trust in the event that any employer terminates participation.

The termination premium imposed here was an estimate of the amount of incurred but unreported claims of employees of withdrawing employers, on the basis of claims experience from previous years. Ordinarily, incurred but unreported claims would be covered from the reserve funds maintained by the Board specifically for this purpose. In this case, however, the reserve funds already were depleted by the excess of reported claims over premiums paid in the year prior to Cal Co-op's withdrawal. Without a termination premium, the Trust Fund would be unable to establish a new reserve. Thus, the Trust Fund contends, imposition of the premium was necessary to protect the trust and was authorized by section IX–E.

Cal Co-op argues that section IX–E was included in the Trust Agreement solely to provide a means by which the Trust Fund could suspend the payment of benefits to employees of an employer who left the trust. Section IX–E states, *"[w]ithout limitation*, these regulations [to protect the trust] may provide for the curtailment ... of benefits attributable to or dependent upon employment with the terminating employer."* (emphasis added). The words "without limitation" are ambiguous. This language could mean that there is no limit on the Board's power to curtail employee benefits in the event of termination. The words "without limitation" also could mean, however, that regulation for curtailment of benefits was not meant to be the exclusive regulation the Board had power to enact. Either interpretation is reasonable. The Board interpreted section IX–E to give it the power to protect the Trust Fund by providing adequate funds to cover claims that had been incurred by Cal Co-op's employees but had not yet been reported to the trust. Since the language is ambiguous, we uphold the Board's reason-

**2.** The Trust Fund contends that interpretation of the Trust Agreement must be based solely on the written terms of that document. The Trust Fund relies on this court's statement in *San Pedro Fishermen's Welfare Trust Fund Local 33 v. Di Bernardo*, 664 F.2d 1344 (9th Cir.1982), that "contract interpretation [must] be confined to the written terms of the welfare trust fund agreement." *Id.* at 1345. *Di Bernardo*, how-

ever, only prevents us from considering oral modifications of trust agreements. Our statement in *Di Bernardo* was not intended to preclude review of other writings that might be incorporated by reference into a trust agreement. Thus, we may consider the terms of Cal Co-op's Subscriber Agreement with the Trust Fund and the CBAs with Local 624, if they are referred to in the Trust Agreement.

able interpretation of the Trust Agreement. *Smith*, 654 F.2d at 655.

■ Cal Co-op argues that other provisions of the trust reveal that the Board did not have the authority to impose a termination premium. One provision states that "no amendment [to the Trust Agreement] shall alter or negate ... any applicable and lawful provision of a Contribution Agreement." Cal Co-op argues that the imposition of a termination premium altered or negated the provision in the 1984 CBA granting Cal Co-op the right to replace the current health and welfare plan with another plan providing the same level of benefits.

Essentially, Cal Co-op argues that the premium is a penalty which deprived it of the right to withdraw freely from the Trust Fund. The premium was adopted in part to deter employers from withdrawing from the Trust Fund in response to the rate increases. Yet, the premium also was established to ensure that a withdrawing employer would satisfy any remaining obligation the employer owed to the Trust Fund for coverage of incurred but unreported claims by employees. The premium was intended to prevent evasion of that obligation by the employer's withdrawal. Thus, the effect of the premium was not to alter or negate Cal Co-op's ability to withdraw from the trust; instead, payment of the premium merely satisfied Cal Co-op's preexisting duty to pay for coverage for its employees up to the point of termination.

■ Another provision of the Trust Agreement, section III–G, states that

"[e]mployers and their bargaining representatives shall have only such liabilities to the Trust as are set forth or authorized hereunder or under their Contribution Agreements. They shall have no other liabilities for the operation or obligations of the Trust, nor for the failure of other Employers to fulfill their obligations to the Trust, except as specifically imposed under ERISA or other laws.

This section reinforces the Board's claim that it had the authority to impose the termination premium, since the section states that employers "shall have only such liabilities to the Trust as are set forth or authorized *hereunder or* under their Contribution Agreements." A termination premium appears to be authorized under section IX–E of the Trust Agreement and thus it would fall within the liabilities contemplated in section III–G.

Cal Co-op, however, makes two arguments that the termination premium violates section III–G. First, the company argues that the termination premium violates this section because no attempt was made to determine the amount of incurred but unreported claims that was attributable to Cal Co-op's employees. This argument adds nothing to Cal Co-op's claim that the Board lacked the *power* to impose the premium. Rather, the argument is directed to the *manner* in which the premium was set. Even assuming the premium was set incorrectly in the present case, the Board still would have authority to impose a correctly set premium under sections III–G and IX–E.

Second, Cal Co-op contends that the contribution rate increases did not replenish reserves. Thus, the premium put the burden on withdrawing employers alone to pay unreported claims, even though the claims actually might be the obligation of the remaining employers. This argument lacks merit. In adopting the rate increases, the Board had noted that the increases were initially only a break-even measure to cover the Trust Fund's current deficit created by the adverse claims experience of the prior year and the resulting increase in insurance rates. The contribution rate increases would have been sufficient to replenish reserves over time, however, as long as employers did not withdraw in response to the increases without paying their fair share of the deficit. The termination premium thus was *not* intended to shift the burden of replenishing reserves to departing employers. The Board established the premium only to ensure that the deficit would not increase because employers withdrew in response to the increases without paying their fair share of the deficit.

Cal Co-op's final argument is that the 1984 CBA froze its contribution liability at an amount necessary to maintain the level of benefits provided for in the April 1, 1981 CBA ("1981 CBA"). Cal Co-op concedes that the contribution rate increases were necessary to maintain that level of benefits. Cal Co-op argues, however, that imposition of the termination premium called for contributions in excess of the amount mandated by the 1981 CBA and thus was not authorized by the 1984 CBA.

Cal Co-op's Subscriber Agreement provides that the company's contribution amount will be set in the CBA. Section 21 of the 1981 CBA set the contribution rate at $141.42 per eligible employee per month. That section also stated:

[s]hould the Trustees of said Trust determine that an additional premium is necessary to maintain the schedule of benefits existing and applicable to the Employer on April 1, 1981 and should the Trustees assess such increase to all participating employers to the Trust, the Employer shall pay such increased premium in an amount and on the date applicable to all participating employers.

Section 21 was replaced by section 19 in the 1984 CBA, which permits Cal Co-op to replace the Trust Fund with an alternate health and welfare plan. The new section 19 omits the above-quoted language requiring payment of any additional amount deemed necessary by the Board, but requires that "the Employer, for the duration of this agreement, shall continue its premium contributions on behalf of eligible employees to a jointly administered trust and *will maintain for the duration of the Agreement, that schedule of benefits which was in effect, upon the execution of this Agreement.*" (emphasis added).

The termination premium is not inconsistent with the maintenance of benefits requirement. The premium enabled the Trust Fund to continue to provide the same level of benefits to Cal Co-op's employees, by requiring a contribution from the company to cover incurred but as yet unreported claims. Even if the 1984 CBA froze Cal Co-op's contributions at the level necessary to maintain 1981–1984 benefits, the termination premium did not add to this liability. Thus, this final contention is meritless. We hold that the termination premium was authorized under the Trust Agreement.

**B. Breach of Fiduciary Duty Defense**

Cal Co-op next argues that even if the termination premium was authorized, its imposition resulted from breaches of the Board's fiduciary duties under ERISA, 29 U.S.C. § 1104(a), and thus Cal Co-op should not be obligated to pay the premium. The Board's fiduciary duties, however, are owed only to participants and beneficiaries of the trust. *C. Colteryahn Dairy v. Western Pennsylvania Teamsters & Employers Pension Fund,* 847 F.2d 113, 119 (3d Cir.1988); 29 U.S.C. §§ 1002(7), 1104. Therefore, Cal Co-op is not entitled to raise a breach of fiduciary duty defense to payment of the termination premium because no fiduciary duty is owed to it as an employer.

**C. Other Bases for Asserting Defenses to Payment of Premium**

Cal Co-op attempted to raise two alleged breaches by the Board as defenses to payment of the termination premium. We examine each alleged breach separately to determine whether either alleged breach provides a basis for a defense against payment of the premium.

**1. *Erroneous Calculation of the Termination Premium***

Cal Co-op first contends that the premium was calculated incorrectly because the data on which the consultant relied was unreliable and no attempt was made to apportion each employer's responsibility for its own employees' incurred but unreported claims. Even assuming that this type of claim could be asserted as a defense to collection of the premium, this first contention is without merit.

In calculating the premium, the Trust Fund's consultant, H. Clay Franklin ("Franklin"), estimated that the Fund would require $3,000,000 for incurred but unreported claims. He stated that he ar-

rived at this figure without using an accumulated lag report, which is an underwriter's tool prepared by insurance companies to estimate present and future claims experience. He also stated that he did not recall exactly how he arrived at this figure, but he was certain he used generally accepted underwriting principles to make the estimate. Next, Franklin added this figure to the estimated prior deficit of the Trust Fund, which was $1,160,000, and the Trust Fund's estimated tax liability, which was $800,000, to determine the Trust Fund's total expected deficit.

Franklin reviewed a summary of the Trust Fund's prior claims experience and calculated the percentage of claims attributable to each of the four types of benefit plans offered by the Trust Fund. He multiplied these percentages by the total expected deficit to determine the amount of the deficit that was attributable to each type of plan. He then divided this second deficit figure by the number of participating employees in each plan type to arrive at an exit premium amount for each employee. When Cal Co-op withdrew from the plan, this exit premium amount was multiplied by the number of participating Cal Co-op employees to calculate Cal Co-op's termination premium liability.

Cal Co-op argues that this calculation method was unreasonable because it was based on estimates and was not calculated in reliance on an accumulated lag report. Cal Co-op failed to make a sufficient showing, however, that the calculation method was in any way arbitrary or capricious. When Franklin verified his estimate of the incurred but unreported claims against an accumulated lag report two years after the original calculation was made, the actual figure for incurred but unreported claims was $3,122,036. The fact that Franklin's estimate was so close to the actual figure tends to substantiate his assertion that he relied on alternate generally accepted underwriting principles to calculate the amount of unreported claims. Cal Co-op offered no evidence to show that the methods used to estimate the Trust Fund's prior deficit or tax liability were unreasonable or that these estimates were erroneous.

Thus, Cal Co-op's claim that the overall calculation somehow was erroneous is wholly unsupported.

In addition, Cal Co-op's claim that the Board made no effort to apportion each employer's responsibility for its own employees' incurred but unreported claims is unsupported by any evidence. In this insurance context, the Board was not required to calculate Cal Co-op's exact liability for actual claims incurred by its own employees but not yet reported to the Trust Fund. Rather, the Board was responsible for calculating the *risk* of incurred but unreported claims and then apportioning that risk among the subscribing employers to determine the withdrawing employer's liability to the trust. The Board did apportion the risk by dividing the estimated *deficit* for each plan type by the number of participating employees in that plan type to determine a per employee exit premium. That per employee figure was multiplied by the number of Cal Co-op employees, apportioning to Cal Co-op its share of the risk. Since the Board's apportionment method was not unreasonable, it must be upheld by this court.

### 2. *Conflict of Interest*

Cal Co-op also contends that the need for the termination premium was questionable and that the decision to impose the premium was tainted by a conflict of interest. The termination premium was adopted in response to Transamerica's proposed increase in insurance rates for the Trust Fund. Maurice Machanich ("Machanich"), the Trust Fund's administrator and consultant on insurance matters, recommended the termination premium without first inquiring of other insurance companies for better rates. Machanich worked for Transamerica for thirty-three years prior to becoming an administrator for the Trust Fund. He receives a commission from the insurance company for keeping the Trust Fund insured with Transamerica. Thus, Cal Co-op contends that Machanich breached his duty of loyalty by recommending the premium without investigating the availability of lower-priced insurance be-

cause he would derive a personal benefit from the insurance company. Since the Board relied on Machanich's recommendation in imposing the termination premium, the existence of a conflict between Machanich's duties to the trust and his own self-interest may have tainted the Board's decision to impose the premium.

We have concluded that Cal Co-op may not raise alleged breaches of the Board's fiduciary duties as a defense here. Yet, Cal Co-op's second contention raises a serious question as to the propriety of imposing the termination premium. In the exercise of our primarily equitable authority under ERISA, *Fujikawa v. Gushiken*, 823 F.2d 1341, 1346 n. 4 (9th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 2913, 101 L.Ed.2d 945 (1988), we must determine whether Cal Co-op may raise the conflict of interest as a defense to payment of the termination premium under section 515 of ERISA, 29 U.S.C. § 1145.

█ Section 515 states that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. The district court determined, for the purpose of awarding attorney's fees, that the termination premium was a "contribution" within the meaning of section 515. The termination premium has the characteristics of a contribution. It was intended to cover the outstanding benefits owed to employees of a withdrawing employer who have incurred claims but have not yet reported them to the Trust Fund. Therefore, the Board's action to collect the termination premium was an action brought to enforce section 515.

Having resolved that section 515 applies to this action, we must determine whether the conflict of interest defense Cal Co-op seeks to assert is permissible under that section. Section 515 does not expressly address the availability of defenses in contribution collection actions. We are charged, however, with developing a uniform body of federal common law to fill in gaps or otherwise effectuate ERISA's statutory scheme. *Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1500 (9th Cir.1984). In developing this federal common law, we look first to the statute, its underlying policies, and its legislative history. We may also refer to other sources such as state law. *Id.*

Section 515 was added to ERISA by the Multiemployer Pension Plan Amendments Act of 1980, Pub.L. No. 96–364, 94 Stat. 1208 (MPPAA). The legislative history of section 515 indicates that its purpose was to simplify contribution collection actions. As the sponsors of the legislation stated during congressional debates,

> [r]ecourse available under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly. Some simple collection actions brought by Plan trustees have been converted into lengthy, costly, and complex litigation concerning claims and defenses unrelated to the employer's promise and the Plan's entitlement to the employer's contributions. This should not be the case. Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor management relations law.... Sound national pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises.

126 Cong.Rec.S. 11673 (daily ed. Aug. 26, 1980) (remarks of Sen. Williams); 126 Cong.Rec.H. 7899 (daily ed. Aug. 26, 1980) (remarks of Rep. Thompson).

Section 515 and its legislative history have been read to preclude the employer from raising any defenses that the employer may have against the union in an action by the trust to collect contributions. *See Southern California Retail Clerks Union and Food Employers Joint Pension Trust Fund v. Bjorklund*, 728 F.2d 1262, 1266 (9th Cir.1984) (fraud in inducement of contract with union is not a defense to contri-

bution collection action); *but see Operating Engineers Pension Trust v. Gilliam,* 737 F.2d 1501, 1503–05 (9th Cir.1984) (fraud in the execution of employer's contract with union may be raised as a defense). The Supreme Court has clarified, however, that section 515 was not meant to preclude all defenses to contribution collection actions. Rather, the section was meant to exclude only "unrelated" and "extraneous" defenses. *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 88, 102 S.Ct. 851, 862, 70 L.Ed.2d 833 (1982).

In *Mullins,* an employer sought to raise the defense that a contribution called for by the trust agreement was illegal under other statutes. The Supreme Court assumed arguendo that the recently enacted MPPAA would apply to the case and noted that section 515 mandated payment of contributions only to the extent the contributions were "not inconsistent with law." The Court determined that the employer could raise illegality as a defense to a section 515 action because an illegal contribution obviously would be inconsistent with the law.

Neither the cases precluding assertion of defenses the employer has against the union nor the Supreme Court's decision in *Mullins* address the issue whether the employer may raise in a section 515 action a defense of conflict of interest that the employer has against the trust itself. The conflict of interest that Cal Co-op seeks to raise goes directly to the Trust Fund's actions in imposing the termination premium and thus is related directly to Cal Co-op's obligation to pay and the Trust Fund's entitlement to the premium. We therefore conclude that permitting Cal Co-op to assert this defense against payment of the termination premium is consistent with the language and legislative history of section 515.

Cal Co-op has raised a prima facie case of conflict of interest by alleging that Machanich receives a commission from Transamerica and thus had an incentive to retain Transamerica as the Trust Fund's insurer. After Transamerica informed the Board that premiums would be raised, Machanich did not contact other insurance companies to see if better rates were available. His recommendation to the Board possibly was tainted by a conflict of interest. The Board contends, however, that Machanich did not investigate other insurance options because he did not believe the Trust Fund would have been able to find a replacement insurer who would offer better rates. Machanich felt, on the basis of his experience in the insurance industry, that it was unlikely that any insurer would provide lower premiums to a trust that was experiencing such serious financial difficulty and had such an adverse claims experience in the prior year.

 Triable issues of fact exist as to whether the Board had full disclosure regarding Machanich's receipt of the commission from Transamerica and as to the actual availability of other insurance options. Thus, we remand to the district court for a determination whether the alleged conflict of interest tainted the decision to impose the termination premium. On remand, the Board will have the burden of showing that Machanich's conflict of interest did not in fact influence the Board's decision.

## II. *Contributions for Summer Employees*

Cal Co-op next contends that the district court erred in finding that the company was liable for contributions on behalf of summer employees who were covered under the plan as dependents of other employees. This issue went to trial after the district court denied the Board's motion for summary judgment. Under the district court's interpretation of the Trust Agreement, the CBAs, and other relevant documents, these employees were included within the definition of eligible employees for whom contributions were to be made. We review the district court's interpretation of these documents de novo. *Kemmis v. McGoldrick,* 767 F.2d 594, 597 (9th Cir. 1985).

 As stated above, the Board's interpretation of the Trust Agreement is entitled to deference if it is reasonable. *Smith,* 654 F.2d at 654–56. As to the

CBAs, we again have formulated special rules to govern interpretation. In *Arizona Laborers, Teamsters and Cement Masons Local 395 Health and Welfare Trust Fund v. Conquer Cartage Co.*, 753 F.2d 1512 (9th Cir.1985), we stated:

> When the operation of an ordinary contract is not clear from its language, a court generally may consider extrinsic evidence to determine the intent of the parties in including that language. That principle is applied with even greater liberality in the case of a collective bargaining agreement. In ascertaining the intent of the parties to a collective bargaining agreement, "the trier of fact may look to the circumstances surrounding the contract's execution, including the preceding negotiations.... It may also consider the parties' conduct subsequent to contract formation ... and such conduct is to be given great weight."

*Id.* at 1517–18 (citations omitted) (emphasis omitted). The general practice, usage, and custom pertaining to all CBAs also is relevant to interpretation. *Id.* at 1518. If a provision of a CBA is ambiguous, its interpretation depends on the intent of the parties to the CBA at the time of its execution. The district court makes factual findings as to the intent of the parties and we review these factual findings under a clearly erroneous standard. *Kemmis*, 767 F.2d at 597.

■ The Subscriber Agreement between the Trust Fund and Cal Co-op requires that the company "shall contribute the amount specified by collective bargaining agreement each month *for each employee subject to the collective bargaining agreement* for the duration of the trust." (emphasis added). Both parties consider the summer employees as part-time workers under the CBAs. Under both the 1981 and 1984 CBAs, part-time employees are covered by all provisions of the CBAs except the seniority provisions. Thus, since these employees are covered by the health and welfare benefits provisions of the CBAs, it would appear that the Subscriber Agreement mandates contributions on their behalf.

Nevertheless, Cal Co-op argues that it never intended to include the summer employees within the definition of an "eligible employee." The 1981 and 1984 CBAs call for contributions on behalf of each eligible employee but the term "eligible employee" is not defined in the CBAs. In 1979, the Trust Fund released a summary of its plan benefits which did define eligibility to include any employee who worked at least 80 hours per month. The 16 employees at issue here fit within this definition.

■ Cal Co-op argues that it was error for the district court to rely on this plan booklet to interpret the CBAs because the CBAs were entered into before the plan booklet was sent out. This argument lacks merit. The argument is based on Cal Co-op's misguided belief that this court must look only to documents preceding the first CBA between Cal Co-op and Local 624. The audit, however, was conducted for the period between January 1, 1982, and July 1, 1985. Thus, the relevant collective bargaining period is just prior to formation of the 1981 CBA. During that collective bargaining period, the company and the union were free to add new terms to the 1981 CBA which would limit the definition of an eligible employee presented in the 1979 plan booklet. If we restricted our consideration only to the period preceding the first CBA, we would ignore the possibility of any future negotiations between the company and the union regarding employee benefits. Since the 1979 plan booklet had been sent out to employers prior to the relevant collective bargaining period, it properly may be considered in determining the intent of the company and the union for the 1981 and 1984 CBAs.

Another provision of the plan booklet also indicates that the 16 employees were not meant to be excluded from the definition of eligible employees. The plan booklet provides that a person is entitled to coverage both as an individual employee and as a dependent of another employee. If an employee is entitled to dual coverage, the benefits are increased to reimburse for 100 percent of actual medical expenses rather than the 80 percent reimbursement

available under single coverage. Thus, the Trust Fund clearly contemplated that it would receive contributions for all otherwise eligible employees regardless of their status as dependents of other employees.

The district court found that Cal Co-op was aware of the possibility of dual coverage. This finding was supported by substantial evidence and cannot be said to be clearly erroneous. *Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Under *Arizona Laborers*, a court may consider conduct subsequent to formation of a CBA in interpreting that document. 753 F.2d at 1518. Machanich, the Trust Fund's administrator, testified that during the period of the audit, Cal Co-op had made contributions for a husband and wife, both of whom were covered as employees of the company and as dependents of each other. The only distinction between these employees and the summer employees at issue here was that the husband and wife were both full-time, permanent employees. The CBAs, however, provided for the same health and welfare benefits for both part- and full-time employees.

There also was testimony that the custom and practice in the industry is to require health and welfare contributions for all employees who are subject to the CBA and who work at least eighty hours per month. Finally, the union's chief negotiator for the 1984 CBA testified that he understood the term "eligible employee" to be defined as specified in the plan booklet. In addition, it was his recollection that his understanding and intent regarding the definition was shared by negotiators for the company.

The only testimony the company offered to support its contention that the summer employees were not covered under the plan was that of Nila Johnson, its personnel manager. She testified that when she became personnel manager in 1980, she was instructed not to make contributions for part-time employees who were covered as dependents of other employees because additional coverage would be duplicative. Ms. Johnson admitted, however, that she was aware of the dual contributions made by the company for the husband and wife who were employed by Cal Co-op. She also admitted that she knew of the plan booklet's provision for 100 percent coverage of claims in the event of dual contributions.

The district court found that the CBA was intended to require contributions for the summer employees. The company's sole evidence against this finding is testimony regarding the company's unilateral practice of not making contributions and an argument that dual contributions merely would be duplicative. The Trust Fund has shown that its plan booklet contemplates the dual contribution situation and provides additional benefits so that dual coverage is not duplicative. The district court's finding is supported by the terms of the CBAs and the plan booklet, the union negotiator's testimony, and evidence of the custom and practice in the industry. Thus, the finding was not clearly erroneous.

### III. *Attorney's Fees*

■ Cal Co-op's final contention on appeal is that the district court erred in awarding attorney's fees, costs, interest, and liquidated damages to the Trust Fund in addition to the principal amount of the termination premium. The district court determined that the termination premium was a "contribution" under section 515 of ERISA, 29 U.S.C. § 1145. The court thus concluded that the award of attorney's fees and costs was mandatory under section 502(g)(2), 29 U.S.C. § 1132(g)(2).

Section 502(g)(2) of ERISA provides "[i]n any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section [515] of this title in which a judgment in favor of the plan is awarded," the court shall award the plan interest, an amount equal to the greater of the interest or liquidated damages provided for under the plan, and reasonable attorney's fees and costs. 29 U.S.C. § 1132(g)(2). We have already determined that the termination premium is a contribution within the meaning of section 515. Because the premium has the characteristics of a contribution, we hold that an award of attorney's

fees, costs, interest, and liquidated damages would be mandatory with respect to the action to collect the termination premium. On remand, the district court is instructed that it must award attorney's fees, costs, interest, and liquidated damages for the Board's action to collect the termination premium if the court finds that the alleged conflict of interest did not taint the Board's decision to impose the premium. Attorney's fees, costs, interest, and liquidated damages are mandatory in any event for the portion of this action pertaining to collection of the contributions for part-time summer employees.

## CONCLUSION

The district court correctly found that Cal Co-op was required to submit contributions on behalf of the sixteen part-time summer employees. Thus, we AFFIRM the entry of judgment in favor of the Trust Fund on the first and second causes of action.

With regard to the sixth cause of action, the termination premium was authorized by the Trust Agreement. However, triable issues of fact exist as to whether its imposition resulted from a conflict of interest which affected the Board's decision regarding the necessity of the premium. Thus, we REVERSE the entry of summary judgment on the sixth cause of action and RE-MAND for a determination whether there was in fact a conflict of interest which tainted the Board's decision. On remand, the district court is instructed that if it determines the Trust Fund correctly imposed the termination premium, an award of attorney fees, costs, liquidated damages, and interest is mandatory under ERISA. The parties shall bear their own costs in this appeal.

AFFIRMED IN PART; REVERSED IN PART AND REMANDED.