Robert S. FREMONT and Henry W. Dybal, Plaintiffs-Appellants,

v.

McGRAW–EDISON COMPANY et al., Defendants-Appellees.

Robert S. FREMONT, Ronald L. McCarthy and Henry W. Dybal, Plaintiffs-Appellees,

v.

McGRAW–EDISON COMPANY et al., Defendants-Appellants.

Nos. 78–2630, 78–2631.

United States Court of Appeals, Seventh Circuit.

Argued May 30, 1979.

Decided Sept. 27, 1979.

Rehearing Denied Oct. 31, 1979.

George V. Bobrinskoy, Jr., Mayer, Brown & Platt, Chicago, Ill., for plaintiffs-appellants.

Byron L. Gregory, Chicago, Ill., for defendants-appellees.

Before PELL, Circuit Judge, GEWIN, Senior Circuit Judge,* and WOOD, Circuit Judge.

PELL, Circuit Judge.

The three plaintiffs, Robert Fremont, Ronald McCarthy, and Henry Dybal, brought this action against their former employer, the Halo Lighting Division of McGraw-Edison Company (Company), to recover benefits allegedly due them under the Company's Profit Sharing and Retirement Trust (the Plan).[1] The Company had denied them the Plan benefits on the ground that their theft of Company property made them ineligible under the Plan for the benefits. The plaintiffs asserted that Section 203 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1053, prohibited forfeiture of their benefits regardless of their thefts. The applicability of § 203 to the plaintiffs was disputed by the Company on various theories. The district court granted summary judgment in favor of McCarthy and against Fremont and Dybal. Both sides appealed.

I.

The facts preceding the dispute in this case are as follows. In June 1959, a profit sharing plan was established for executives and employees of Halo Lighting Products, Inc. In June 1967, Halo was acquired by McGraw-Edison Co. Halo thereafter operated as a division of McGraw-Edison and the Halo profit-sharing plan continued as a separate entity. Halo employed Fremont in 1956, McCarthy in 1961, and Dybal in 1970.

Fremont, who was a Plan trustee for 16 years, left the Company in late 1975 to form

---

* Senior Circuit Judge Walter P. Gewin of the United States Court of Appeals for the Fifth Circuit is sitting by designation.

1. The plaintiffs also named as defendants the administrator of the Plan and the Plan trustees,

but the position of all the defendants is the same and thus we will for convenience refer merely to the Company throughout this opinion.

his own business. Although the actual date of his resignation is an important issue in this appeal which we will discuss *infra*, it is undisputed that during November 1975, he negotiated a voluntary termination of his employment under which the Company paid him $130,000 and agreed to continue to employ him and pay him a salary at least through the end of 1975.

During October and November of 1975, Fremont and McCarthy, unknown to the Company, stole, among other things, computer printouts, microfilm cards, customer lists, and price lists from the Company, some of which included valuable trade secrets and confidential information. Dybal, who sometime in 1976 also stole Company property, resigned on March 19, 1976, and joined Fremont. McCarthy followed on May 3, 1976. The Company was unaware of the thefts until after all three had resigned.

In July 1976, the Company filed suit in Illinois state court against Fremont and his new company to enjoin them, *inter alia*, from using trade secrets and from raiding Company employees. During the course of that litigation, Fremont for the first time admitted the thefts. After he made these admissions, the parties settled on August 19, 1976, and Fremont repaid to the Company everything he received under the termination agreement, including the salary he received for the period after November 11, 1975, the date of the termination agreement. The settlement expressly left unresolved the question of the plaintiff's profit-sharing benefits under the Plan.

On September 23, 1976, the plaintiffs made written claims for their benefits. These claims were denied by the Company. This action followed. Because the rights of the three plaintiffs are somewhat different under ERISA as a result of different resignation dates, years of service, etc., we will address their claims separately.

## II.

The cornerstone of Fremont's claim for the benefits is § 203(a) of ERISA which provides in relevant part:

(a) Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age and in addition shall satisfy the requirements of paragraphs (1) and (2) of this subsection.

.    .    .    .    .

(2) A plan satisfies the requirements of this paragraph if it satisfies the requirements of subparagraph (A), (B), or (C).

(A) A plan satisfies the requirements of this subparagraph if an employee who has at least 10 years of service has a nonforfeitable right to 100 percent of his accrued benefit derived from employer contributions.

29 U.S.C. § 1053(a)(2)(A). This provision, Fremont argues, renders invalid Section III(D) of the Plan which states in relevant part:

*Dismissal for Cause and Termination of Employment.* No part of the share of any of the following participants shall become vested in them: (i) a participant who is discharged by reason of dishonesty, theft, embezzlement, or disclosure of trade secrets or who voluntarily terminates his employment with the Company after having committed such acts.

Clearly, § 203 renders invalid "bad boy" clauses such as § III(D), and the parties before us do not dispute that. The dispute arises over whether Fremont lost his rights to benefits before the effective date of § 203. That section became effective on January 1, 1976.[2]

█ Fremont offers two alternative theories by which § 203 would apply to prohibit forfeiture of his benefits under the Plan. First, he argues that § 203 prohibits any forfeiture of benefits after January 1, 1976,

---

**2.** Section 203 "shall apply in the case of plan years beginning after December 31, 1975." 29 U.S.C. § 1061(b)(2). The Plan in the present case was on a calendar year basis and thus § 203 applied to it as of January 1, 1976.

and that the forfeiture of his benefits occurred approximately 10 months later when the Company officially denied his claim for the benefits. We cannot agree that the date a former employee is denied his request for benefits is the relevant date for determining the applicability of § 203 if the former employee was not employed after the effective date of § 203. The language of the statute belies such an interpretation. It merely says that effective January 1, 1976, each pension plan shall provide that an *employee's* right to benefits is nonforfeitable. We agree with the district court that § 203 only protects against forfeiture the benefits of those who are in an employee status on January 1, 1976, or thereafter.[3] Fremont nevertheless offers four cases in support of his theory that the date of forfeiture is critical. *Winer v. Edison Bros. Stores Pension Plan*, 593 F.2d 307 (8th Cir. 1979); *Fox v. Abrams*, No. CV 77–881–ALS (C.D.Cal.1978); *Morgan v. Laborers Pension Trust*, 433 F.Supp. 518 (N.D.Cal.1977); *Amory v. Boyden Associates, Inc.*, 434 F.Supp. 671 (S.D.N.Y.1976).

*Winer* is not persuasive because the plaintiffs-employees denied benefits in that case were not terminated from employment until May 10, 1976, well after § 203 had become effective. For this reason, the court does not address the problem of the application of § 203 to employees who resign or are terminated before the effective date of § 203. *Morgan v. Laborers Pension Trust, supra,* is also inapposite because it does not involve construction of § 203, the language of which is critical to our conclusion.

■ *Amory v. Boyden Associates, supra,* also does not directly address the issue which we find dispositive of Fremont's claim, the inapplicability of § 203 to one whose employee status ends before the effective date of § 203. Fremont cites dicta

in *Amory* which suggests that the date of forfeiture is the relevant date for determining the applicability of § 203. The court stated:

> Several provisions of the Act are here relevant: § 1144, effective as of January 1, 1975, which preempts State law concerning employee benefit plans; and § 1053 [ERISA § 203], effective January 1, 1976, which provides detailed specifications which every employee benefit plan must meet and—as of the 1976 effective date—renders void any forfeiture provision such as the one here at issue.
>
> It is at once obvious that nothing in the Act expressly deals with a forfeiture declared in the period between January 1, 1975 (when State law was replaced by Federal) and *January 1, 1976 (when forfeiture of this nature became outlawed).*

434 F.Supp. at 672 (emphasis added). Although the plaintiff in *Amory* resigned in July 1975, before § 203's effective date, the court did not address, nor apparently did the defendant raise, the theory which we find dispositive. The court denied the company's motion for summary judgment on another theory. The court reasoned that a forfeiture "declared in the period between January 1, 1975 (when State law was replaced by Federal) and January 1, 1976 (when forfeiture of this nature became outlawed)" must be governed by federal common law. Without the aid of any relevant precedent, the court declared the common law to require that forfeiture of vested pension rights be subject to a rigorous reasonableness test which creates a presumption of unreasonableness. *Id.* at 672–73. Even if we assume without deciding that the *Amory* court's analysis is correct, it would not alter our result in the present case because we are of the opinion that

---

**3.** Although resort to legislative history is unnecessary when, as here, the language of the statute is clear, we note that the legislative history is consistent with our construction of the statute. Early drafts of § 203 extended the vesting provisions to include "participants," defined in ERISA to include former employees, 29 U.S.C. § 1002(7), but the section which was ultimately enacted is restricted to "employees." *See* Senate Bill S. 4 [Report No. 93–127], 93d Cong., 1st Sess. at 509–514, U.S.Code Cong. & Admin.News 1974, p. 4639. If Congress had intended § 203 to affect interests of former employees, it would have used the term "participant."

§ III(D) would withstand a rigorous reasonableness test as applied to the plaintiffs. It is not unreasonable for a company to deny profit-sharing benefits to high level executives who in violation of the Plan admittedly stole valuable customer lists, trade secrets, and other Company property and resigned to establish a competing business. Thus, we are not persuaded by *Amory* because it failed to address the theory we find dispositive and because our result is not inconsistent with the analysis it used.

In *Fox v. Abrams, supra,* the plan year began on June 1, so § 203 became effective as to that plan on June 1, 1976. The plaintiffs resigned on May 6, 1976, and June 1, 1976. The court, in an alternative holding, held the forfeitures invalid because they occurred after June 1, 1976, the effective date of § 203. The court did not address the theory which we find persuasive in the present case, and since it probably would have caused a different result as to the employee who resigned on May 6, 1976, we must disagree with the reasoning of *Fox.* The absence of any mention of our theory in the *Fox* opinion suggests that the parties did not raise it and that the court did not *sua sponte* consider it.[4] This leaves open the possibility that the *Fox* court may agree with us when the issue is squarely presented to it. Thus, the four cases offered by Fremont do not persuade us that the date of forfeiture determines the applicability of § 203 when the plaintiff's status as an employee ended before the effective date of § 203.

■■■ Second, Fremont argues alternatively that if the date of employment termination is the relevant date for determining the applicability of § 203, he was employed on January 1, 1976, the date § 203 became effective. The district court disagreed and found that Fremont's employment and participation in the Plan ended at the end of 1975. Our review of the facts does not indicate that the district court erred in this regard. Fremont resigned on November 11, 1975. He stayed on for three more days until his successor was named and then he vacated his office and thereafter performed no other duties for the Company. The November 11, 1975 voluntary termination agreement, upon which Fremont heavily relies, stated: "The Company will retain you as an employee at your current salary rate through January 1, 1976, at which time your employment will terminate." The district court found, however, that the date of January 1, 1976, was used in the termination agreement to assure Fremont that he would qualify for the Company's 1975 contribution to the Plan. The Plan provided that only the Plan shares of persons actively employed by the Company from January 1, 1975 through December 31, 1975 could benefit from the Company's 1975 contribution. Thomas McKay, Jr., general counsel for the Company explained:

> The January 1, 1976 termination date of Fremont's employment which appears on the November 11, 1975 agreement. . . . was suggested shortly before the signing of the agreement by Fremont's counsel to make clear, as Fremont's counsel stated, that Fremont was to be employed by McGraw for the entire calendar year of 1975.

Moreover, as part of the state court settlement, Fremont returned all the money he received from the Company under the termination agreement, including the salary he received for the period after November 11, 1975. Thus we cannot say that the district erred in finding no material issue of fact regarding Fremont's termination date.[5] For these reasons we affirm the district

---

4. The possibility exists, of course, that the *Fox* court considered the theory we find dispositive but found it to be so unpersuasive that even the briefest discussion of it was unnecessary. We, however, prefer to believe that this possibility did not in fact occur.

5. Fremont argues that because the Company had alleged in its state court complaint that Fremont was employed on January 1, 1976, it cannot now deny that allegation. We are unpersuaded by this argument because Fremont denied in his answer to the complaint that he was employed on January 1, 1976.

court's summary judgment against Fremont.[6]

### III.

The district court granted summary judgment for McCarthy on the theory that § 203 applied to prohibit forfeiture of his benefits because he was an employee after the effective date of § 203.[7] The Company's appeal asserts several theories. First, the Company argues that even though McCarthy was an employee in 1976, he had no rights in the Plan as of the effective date of § 203 because of his thefts in 1975. Section 203 protects an employee's *right* to his normal retirement benefit, and the Company contends that McCarthy lost any right he had in the Plan when he stole Company property in 1975. Thus, on January 1, 1976, when § 203 became effective, he had no rights to be protected. The Company's theory is that a participant's interest in the Plan is inchoate and that it vests only when the participant terminates his employment without having committed an act described in § III(D). If the participant commits one of the proscribed acts, the inchoate interest or the prospect of it ever vesting is lost at that time.

We cannot agree with this theory for several reasons. First, even under the language of the Plan, McCarthy's rights in the Plan were not absolutely lost at the instant he committed the thefts. Section III(D) states: "The Individual Trustees, in their sole discretion, shall determine whether a participant was discharged or his employment was terminated under circumstances set forth in this Section III(D) and shall act uniformly with respect to participants." The Trustees did not exercise this discretion until late 1976, well after § 203's effective date. Prior to their exercise of the discretion, it cannot be said that McCarthy's rights in the Plan were definitely lost.[8]

Furthermore, the Company's theory in essence interprets the Plan to work an automatic forfeiture of a participant's benefits. A similar theory was recently rejected by the Eighth Circuit, that court explaining:

> The thrust of the appellants' argument is that there was not forfeiture of vested rights after January 1, 1976, because the rights of Winer and Fingerhut were forfeited "automatically" by the plan terms at the time of their misconduct prior to January 1, 1976. We find little merit to this contention. A forfeiture does not occur immediately by the self-executing operation of a plan provision at the time of an employee's misconduct. Rather, a forfeiture occurs when a pension committee declares the forfeiture by denying the employee's pension claim.

*Winer v. Edison Brothers Stores Pension Plan*, 593 F.2d 307, 312 (8th Cir. 1979). To allow an automatic forfeiture to block the application of § 203, especially where the language of the Plan does not expressly provide for it, would be inimical to the purposes of ERISA. The *Winer* court described the evils of automatic forfeitures.

> Automatic forfeitures would place intolerable burdens on employees. They would be required to constantly oversee operations of pension committees in order to protect themselves against abuses and errors that could pass unnoticed. Otherwise, they would risk losing their cause of action years before they applied for pension benefits. . . . Moreover, such a rule would allow pension committees to "bootstrap" themselves into positions where they could rely indefinitely on pre-ERISA conduct to deny pension benefits to employees based on provisions clearly prohibited by ERISA.

*Id.* We agree with *Winer* and thus conclude that McCarthy did not lose all rights

---

6. The Company presented other arguments in rebuttal to Fremont's claim which we need not address since we have affirmed on one theory.

7. There is no dispute that McCarthy was employed into May 1976, well after § 203 became effective on January 1, 1976.

8. The Company argues in response that the Trustees' duty to act uniformly eliminated their discretion to preserve McCarthy's rights under the Plan. Although that duty limited their discretion, we cannot agree that it totally eliminated it.

to Plan benefits before January 1, 1976. Thus, § 203 applied to prohibit forfeiture of his benefits.

Our conclusion that McCarthy's rights were not forfeited until the Plan trustees so declared in 1976, and that § 203 therefore applied, is not inconsistent with our conclusions regarding Fremont, we upheld the denial of Fremont's benefits, even though that forfeiture also occurred in 1976, because he was not an employee in 1976. Thus, for § 203 to apply, one must be an employee after its effective date and the forfeiture of one's benefits must occur after its effective date.

The Company also argues that McCarthy is estopped from relying on § 203 because that section applies only because of his concealment of the thefts. That is, if he had disclosed the thefts when they occurred, his Plan benefits very likely would have been forfeited before January 1, 1976, when § 203 became effective. This argument has no merit because it flies in the face of the purpose of § 203 to prohibit forfeiture of accrued benefits regardless of whether the employee engaged in improper conduct of any kind. Were we to uphold the Company's estoppel theory, it could for decades forfeit employee pension benefits for employee bad acts that occurred prior to the effective date of § 203. This is as violative of legislative intent as is automatic forfeiture discussed *infra.* *Cf. Winer v. Edison Brothers Stores Pension Plan,* 593 F.2d at 312.

The Company, in a counterclaim, asserted its theory that Fremont, a trustee for the Plan for sixteen years through 1975, breached his fiduciary duty imposed by ERISA by not disclosing his and McCarthy's thefts so that the Plan could have retained their Plan shares and reallocated them to other participants' accounts by December 31, 1975. In other words, if Fremont had

disclosed the thefts when the committed them, the trustees could have forfeited their benefits before the effective date of § 203. The Company also contends that because McCarthy assisted Fremont in this alleged breach of his fiduciary duty by conspiring in the concealment of their thefts, McCarthy is equally liable. The Company thus concludes that McCarthy and Fremont must recompense the Plan for any benefits paid to them. Only McCarthy's benefits are really at issue because Fremont's were properly forfeited for other reasons. However, as we understand the Company's theory, Fremont and McCarthy are jointly responsible for any benefits either might otherwise receive.

The Company's theory in this counterclaim is grounded on §§ 404 and 409 of ERISA, 29 U.S.C. §§ 1104 and 1109. Section 404(a)(1) provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . ." Section 409(a) requires a fiduciary "to make good to such plan any losses to the plan resulting from each such breach [of fiduciary duty] . . . ." The district court dismissed the Company's counterclaim for failure to state a claim on the ground that the Company was trying to reach a result by indirection which contradicts both the letter and spirit of ERISA. We cannot agree. Fremont's concealment of McCarthy's thefts clearly stated a claim for breach of his fiduciary duty.[9] Fremont's brief on appeal appears to confuse or obfuscate the nature of the breach by implying that the alleged breach was the thefts rather than their concealment. Although the thefts were not directly related to Fremont's duties as a trustee, his concealment of those thefts until after the effective date of § 203 directly resulted in a loss of Plan assets.[10] The district court,

---

**9.** Although there is very little authority interpreting the scope of this fiduciary duty under ERISA, one court has stated that the provisions of § 404(a) "embody a carefully tailored law of trusts, including the familiar requirements of undivided loyalty to beneficiaries, the prudent man rule, the rule requiring diversification of investments and the requirement that fiduciar-

ies comply with the provisions of plan documents to the extent that they are not inconsistent with the Act." *Eaves v. Penn,* 587 F.2d 453, 457 (10th Cir. 1978).

**10.** Although the trustees of the Plan had some discretion to grant McCarthy his benefits notwithstanding the thefts, it is quite clear that the

as previously noted, dismissed the counterclaim on the basis that it was a direct attempt to accomplish that which was not permitted by ERISA. Looking only at the counterclaim against Fremont, however, the remedy under § 409(a) would not be requiring forfeiture of benefits protected by § 203, but rather would be requiring the fiduciary to restore the Plan to the position it would have been in were it not for the breach. In this instance that remedy happens to be measured by McCarthy's benefits. The question is not before us as to whether Fremont would likewise be liable for benefits received by him as under our holding he will not receive any.

The question may be a close one as to McCarthy's liability under the counterclaim because of his aiding Fremont in a breach of fiduciary duty resulting in benefit to McCarthy; however, on balance we are of the opinion that the counterclaim was correctly dismissed as to McCarthy. While he no doubt benefitted from Fremont's concealment in which he was a participant, the fiduciary duty rested solely on Fremont. We think it is proper to consider as we have, the separate obligations under the statute which rested on Fremont as a trustee. McCarthy had no such statutorily imposed duty.

We are not saying that in an ordinary civil action against a trustee, others who have aided him, or conspired with him, in a breach of fiduciary duty may not be liable to the extent that they have profited from the breach. *See* Restatement, Second, Trusts § 256. Here, however, McCarthy's act of joining in the concealment, or inaction in non-revealing as the case may be, not arising out of any duty on his part as a trustee cannot, in our opinion, be disassociated from its impact upon legislatively granted rights under § 203. There is too

much interrelationship between the two aspects for us to hold otherwise.

We, therefore, reverse the district court's dismissal of the counterclaim as to Fremont and affirm the dismissal as to McCarthy and remand for further proceedings consistent with this opinion.

## IV.

■ The district court granted summary judgment against Dybal, reasoning that his benefits were properly forfeited under either the original Plan or the Plan as amended on September 30, 1976 (Amended Plan). Dybal was an employee for less than six years when he resigned in March 1976. Under § 8.2 of the Amended Plan, which is consistent with § 203, he was entitled to no benefits because he was an employee for less than 10 years and his accrued benefits were thus forfeitable.[11] *See* 29 U.S.C. § 1202(c); 26 U.S.C. § 411(a)(2)(A); 26 C.F.R. § 1.411–(a)–4(c) example (1). Even though the Amended Plan was expressly made retroactive to January 1, 1976, Dybal argues that there was no forfeiture-for-cause provision in effect when he left the Company because Section III(D) of the Plan had been invalidated by § 203 of ERISA on January 1, 1976, and the Amended Plan had not yet been adopted. A premise of this argument is that the Amended Plan could not apply retroactively to January 1, 1976. The Special Reliance Procedure issued by the Internal Revenue Service and the Department of Labor on November 5, 1975, however, provided that amendments to plans adopted when the Company adopted its Amended Plan (September 30, 1976) which are adopted to satisfy the requirements of, among other sections, § 203, "shall be deemed to have satisfied the requirements of [§ 203] . . . for the entire period from the beginning of the

thefts would provide a substantial probability that the trustees would exercise their discretion to deny the benefits. This substantial probability is sufficient to create a fiduciary duty in Fremont to disclose the thefts.

11. Section 8.2 of the Amended Plan provides that if an employee with less than 10 years

service commits certain acts, including stealing company property and disclosing trade secrets, his entire account balance in the Plan shall become a remainder and he shall not be considered ever to have had any nonforfeitable interest in the Plan.

first plan year to which the requirements are applicable to such plan. . . ." Rev. Pro. 76–31, CCH Pension Guide ¶ 17,-256A. Thus, in the present case, the Amended Plan applied retroactively to January 1, 1976 permitting the Company to deny Dybal his benefits.

Dybal also invokes § 203(c)(1)(A) to argue that § 8.2 of the Amended Plan was not effective as to him. That section of ERISA provides:

> A plan amendment changing any vesting schedule under the plan shall be treated as not satisfying the requirements of subsection (a)(2) of this section if the nonforfeitable percentage of the accrued benefit derived from employer contributions (determined as of the later of the date such amendment is adopted, or the date such amendment becomes effective) of any employee who is a participant in the plan is less than such nonforfeitable percentage computed under the plan without regard to such amendment.

29 U.S.C. § 1053(c)(1)(A). Dybal has not demonstrated, however, that the nonforfeitable percentage of the accrued benefit for any employee under the Amended Plan was less than that under the Plan. Moreover, § 8.2 of the Amended Plan does not affect any nonforfeitable interests. Under § 203 the interests of an employee who has been with the contributor employer less than 10 years may be forfeitable if the Plan complies with § 203(a)(2)(A). For these reasons, we affirm the district court's summary judgment against Dybal.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.