**Penelope CLARKE, as personal representative of the Estate of Howard PICKARD, Plaintiff,**

v.

**FORD MOTOR COMPANY, and Ford General Retirement Plan, Defendants.**

No. 01–C–0961.

United States District Court, E.D. Wisconsin.

Oct. 27, 2004.

Jordan M. Lewis, Minneapolis, MN, Michael Herbrand, Grafton, WI, for Plaintiff.

Nick Kotsonis, Milwaukee, WI, Neil L. Johnson, for Defendants.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Penelope Clarke, as the personal representative of her deceased father, Howard Pickard ("Pickard"), a former employee of Ford Motor Company and a participant in Ford's General Retirement Plan (collectively "Ford"), brings this class ac-

tion[1] under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff alleges that Ford violated 29 U.S.C. § 1132(a)(1)(B) by failing to pay benefits owed to Pickard and class members, and that it breached its fiduciary duty in violation of 29 U.S.C. § 1132(a)(3) by failing to comply with various substantive provisions of ERISA and/or the regulations implementing them. Before me now are the parties' cross-motions for summary judgment on the issue of liability.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Pickard worked for Ford from January 25, 1954, to June 30, 1966, when he resigned to open a Ford dealership. On February 6, 1975, he reached age sixty-five and, in March 1975, became eligible to receive normal retirement benefits.[2] However, he did not then apply for benefits. The record does not disclose whether Ford notified Pickard of his right to receive benefits, but Ford's practice was to send a notice letter to employees eligible for benefits when they separated from Ford and when they reached retirement age.

Effective July 1, 1994, Ford eliminated its "age seventy rule," which provided that employees who separated from service prior to January 1, 1976, and did not apply for benefits until they were over seventy could not receive benefits. When it eliminated the rule, Ford sent a "benefits letter" through the Social Security Administration to 291 former employees including Pickard whom it believed might be affected by the change. The letter stated among other things:

Our records indicate that you separated from Company employment prior to January, 1976, and were entitled to a benefit from the General Retirement Plan (GRP). You presently are not receiving benefit payments.

If you have applied for and been denied a GRP benefit due to the age 70 requirement, or have never applied, we encourage you to immediately contact [Ford] to apply for your benefit.

(J.A. tab 4.)

As a result of the letter, 161 Ford retirees, including Pickard, applied for benefits. Ford began paying retirement benefits to these individuals as of the effective dates of their applications, which in Pickard's case was August 1, 1996. Plaintiff retained counsel for Pickard, who was eighty-six and in poor health, and counsel advised Ford that in his view Pickard was entitled to benefits retroactive to March 1975. Ford disagreed and declined to make payments to Pickard for the period prior to August 1, 1996.

Pickard died on August 2, 1997, and his counsel continued to correspond with Ford on behalf of plaintiff, Pickard's personal representative. Plaintiff subsequently appealed Ford's refusal to pay benefits retroactive to March 1975. On May 7, 1998, Ford denied plaintiff's appeal. Plaintiff then appealed to Ford's General Retirement Committee ("GRC"), and on June 21, 2000 the GRC rejected her appeal. Plaintiff then commenced the present action.

Additional facts will be stated in the course of the decision.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to inter-

---

1. *See Clarke v. Ford Motor Co.,* 220 F.R.D. 568 (E.D.Wis.2004). The class consists of 161 Ford retirees.

2. Under Ford's retirement plan, a retiree could receive benefits commencing one month after his or her sixty-fifth birthday.

rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). When both parties have moved for summary judgment, both are required to show that no genuine issues of fact exist, taking the facts in the light most favorable to the party opposing each motion. If issues of fact exist, neither party is entitled to summary judgment. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir.1983).

## III. DENIAL OF BENEFITS CLAIM

### A. Standard of Review

■■■ Plaintiff argues that I should review Ford's denial of benefits under a de novo standard, while defendant contends that the more deferential "arbitrary and capricious" standard is proper. If Ford's denial of benefits was based on an interpretation of a statute or regulation, I review it de novo. *Stang v. Clifton Gunderson Health Care Plan*, 71 F.Supp.2d 926, 932 (W.D.Wis.1999). If the denial was based on a construction of the plan, I review it de novo unless the plan conferred discretion, in which case I review it under the arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

The record makes clear that Ford's decision was based in part on its understanding of ERISA. In its May 7, 1998 letter denying plaintiff's request for retroactive benefits, Ford justified the denial on the ground that "Pickard terminated employment prior to the effective date of ERISA's minimum vesting requirements." (J.A. tab 17.) However, the record also contains evidence that Ford's decision was based on its understanding of its retirement plan. In a number of communications, Ford indicated that under its interpretation of the plan applying for benefits was a condition of eligibility to receive them. On April 26, 1997, Ford stated that benefits "are effective the first day of the month following the signed application." (*Id.* tab 9.) On July 31, 1997, Ford advised that "benefits shall not be payable for any periods prior to the date of application." (*Id.* tab 10.) On March 12, 1998, Ford denied plaintiff's initial appeal stating that Pickard was eligible to receive benefits "upon filing an application." (*Id.* tab 16.) On November 5, 1999, Ford informed plaintiff that "the Plan does not permit a payment under these circumstances." (*Id.* tab 21 at 3.) The minutes of the GRC's June 21, 2000 meeting state that the "application rules applied to this participant and do not provide retroactive reimbursement." (*Id.* tab 28.) Finally, on June 29, 2000, Ford notified plaintiff of the GRC's decision, stating that "[u]nder the terms of the retirement plan, there are no provisions'that require commencement of benefits without application to terminated employees." (*Id.* tab 29.)

Thus, Ford denied plaintiff's request for retroactive benefits based both on its view of ERISA and on its interpretation of its plan. Insofar as Ford's decision was based on ERISA, I will review it de novo. To the extent that the decision was based on Ford's interpretation of the plan, to ascertain the correct standard of review I

must determine whether the plan conferred discretion. However, I must first decide which of several Ford plans to analyze: the 1965 plan, which was in effect when Pickard separated from Ford; the 1973 plan, which was in effect when he reached age sixty-five; or the 1995 plan, which was in effect when he applied for benefits. Ford takes no position on which plan applies, stating that all three confer discretion and make application a condition of eligibility. Plaintiff takes no position on whether the 1965 or 1973 plan applies but argues that the 1995 plan does not apply because it was enacted after Pickard's right to benefits vested.

■ I conclude that the 1965 plan controls. Plans or plan amendments that take effect after an employee has terminated employment generally do not affect the employee's right to benefits. *Pratt v. Petroleum Prod. Mgmt., Inc. Employee Sav. Plan & Trust*, 920 F.2d 651, 661 (10th Cir.1990) (stating that an employee is entitled to benefits in accordance with the terms of the plan as of the date of termination from employment); *see also Wal-Mart Stores, Inc. Associates' Health & Welfare Plan v. Wells*, 213 F.3d 398, 403 (7th Cir.2000) (holding that plan amendment which took effect after benefits were received was inapplicable). Pickard terminated employment in 1966, at which time the 1965 plan was in effect. Thus, I will analyze the case under the 1965 plan.

■ As previously indicated, if Ford's denial of benefits was based on its construction of its plan and the plan conferred discretion, Ford's decision may be set aside only if it was arbitrary and capricious. *Firestone Tire & Rubber Co.*, 489 U.S. at 115, 109 S.Ct. 948; *see also Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 981 (7th Cir.1999). No "magic words" are required to confer discretion. *Herzberger*

*v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir.2000). It is sufficient if the plan authorizes the plan administrator "to construe and interpret the Plan." *Fuller v. CBT Corp.*, 905 F.2d 1055, 1058 (7th Cir. 1990); *see also Exbom v. Central States, S.E. & S.W. Areas Health & Welfare Fund*, 900 F.2d 1138, 1142–43 (7th Cir. 1990) (stating that a plan that gives a trustee power to construe its provisions confers discretion). The 1965 plan states that the GRC "shall administer the benefit structure of the Plan, and to this end may construe the Plan." (J.A. tab 1 at F00354.) Ford argues that such language conferred discretion on it. I agree. The language stating that Ford "may construe the Plan" was sufficient to confer discretion.

Nevertheless, plaintiff argues that I should review Ford's construction of its plan de novo because in notifying her of its denial of benefits, Ford failed to comply with federal regulations. Title 29 C.F.R. § 2560.503–1(g)(1)(ii) requires that when an administrator notifies a participant of an adverse benefit determination, the administrator must include in the notification a "reference to the specific plan provisions on which the determination is based." 29 C.F.R. § 2560.503–1(g)(1)(ii) (2004). Neither Ford's May 8, 1998 letter notifying plaintiff of its denial of her initial appeal or its June 29, 2000 letter notifying her of the GRC's adverse decision included such a reference. Thus, Ford failed to satisfy the requirements of the above regulation. Ford also failed to explain the reasoning process by which it concluded that the language of its plan justified the denial. *See Exbom*, 900 F.2d at 1142–43 (requiring articulation of connection between plan language and decision). These failures arguably warrant reviewing Ford's decision de novo rather than under the arbitrary and capricious standard. *See, e.g., Matuszak v. Torrington Co.*, 927 F.2d 320, 322–

23 (7th Cir.1991) (stating that even though plan conferred discretion, where reasons offered for denial in court differ from those given at time of original denial court may review decision de novo). However, because Ford's plan conferred discretion and because, as previously discussed, Ford communicated to plaintiff a number of times that its decision was based on its understanding of its plan, albeit without explaining its reasoning, I conclude that the proper standard of review of Ford's interpretation of its plan is the arbitrary and capricious standard.

### B. Application of Standard

#### 1. Ford's Construction of the Language of its Plan was Unreasonable

■ Under the arbitrary and capricious standard, I ask whether Ford's denial of benefits " 'is based on a reasonable explanation of relevant plan documents.' " *Hess v. Hartford Life and Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir.2001) (quoting *Exbom*, 900 F.2d at 1142–43); *see also Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1052 (7th Cir.1987) (stating that under arbitrary and capricious standard, decision cannot be reversed merely because it is wrong, but only if it is unreasonable). I cannot set aside the decision if Ford made an informed judgment and articulated a satisfactory explanation for such judgment, i.e., an explanation that made a " 'rational connection' " between the " 'text under consideration' " and the " 'conclusion reached.' " *Cuddington v. N. Ind. Public Serv. Co.*, 33 F.3d 813, 817 (7th Cir.1994) (quoting *Exbom*, 900 F.2d at 1143). However, " 'deferential review is not no review,' " and " 'deference need not be abject.' " *Hess*, 274 F.3d at 461 (quoting *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir.1996)). "In some cases, the plain language or structure of the plan or simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious." *Id.; see Filipowicz v. Am. Stores Benefit Plans Comm.*, 56 F.3d 807, 814 (7th Cir.1995) (concluding that ignoring the plain language of the plan and denying benefits was arbitrary and capricious); *see also Swaback v. Am. Info. Tech. Corp.*, 103 F.3d 535, 540 (7th Cir. 1996) (same). In determining the reasonableness of an interpretation, I interpret plan language as would a person of average intelligence and experience. *Id.* at 540–41.

The parties agree that because Pickard worked for Ford for more than ten years, reached his normal retirement date and applied for benefits, he was entitled to receive retirement benefits. The parties disagree, however, about the amount of benefits that Pickard was entitled to receive. Article VI section 1A of the plan, entitled "Amount of Benefit," governs this question. It provides:

> The monthly normal retirement benefit payable on or after January 1, 1965 out of the Retirement Fund for a member eligible therefor who shall make application to the Committee therefor, shall be whichever of the following is applicable:
>
> .    .    .    .    .
>
> (3) For a member who shall retire on or after September 1, 1961, an amount equal to $4.25 multiplied by the number of his years of credited service at retirement;
>
> provided, however, that no benefit shall be payable to any person having less than 10 years of credited service upon normal retirement.

(J.A. tab 1 at F00325) (footnotes omitted).

Pickard retired after September 1, 1961, his normal retirement date was March 1,

1975, on which date he had 12.7 years of credited service, and he applied for benefits. Thus, it would appear from the language of section 1A that he became eligible for benefits on March 1, 1975, and upon applying for them was entitled to a monthly benefit of $4.25 times 12.7 years for every month after the month in which he became eligible. However, as Ford construed section 1A, applying for benefits was a condition of eligibility to receive them, like working for ten years and reaching age sixty-five. In Ford's view, its plan "requires submission of an application for benefits *as a condition of eligibility.*" (Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 6.) (emphasis in original). Based on such construction, Ford concluded that Pickard was not entitled to benefits as of his normal retirement date but rather as of August 1996 when he applied for them.

As set forth below, I conclude that Ford's construction of the language of its plan was unreasonable. First, the language of section 1A does not support Ford's construction. The first clause of the section provides that benefits will be paid to "a member eligible therefor," and the second clause imposes on such eligible member the obligation to "make application to the Committee therefor." Section 1A's use of separate clauses—the first restricting benefits to "eligible" members and the second requiring eligible members to apply for benefits—makes clear that under the plan applying for benefits is not a condition of eligibility but an additional requirement. To read section 1A as making applying for benefits a condition of eligibility is unreasonable because, so read, the section is redundant and linguistically nonsensical. In effect, it would state that "a member eligible" for benefits must "make application to the Committee" in order to become eligible for benefits. An

ERISA plan is a contract, *Herzberger,* 205 F.3d at 330, and the language of a contract may not be interpreted to read nonsensically. *Dispatch Automation, Inc. v. Richards,* 280 F.3d 1116, 1119 (7th Cir.2002). Further, the redundancy created by Ford's construction cannot be eliminated without reading out of section 1A the language indicating that only members who are already "eligible" may apply for benefits. Courts should not interpret contracts to render language superfluous. *Brown & LaCounte, L.L.P. v. Westport Ins. Corp.,* 307 F.3d 660, 663 (7th Cir.2002) (stating that language in a contract should be construed as having a purpose rather than avoided or rendered meaningless). Thus, a common sense construction of the operative language of the plan indicates that Ford's interpretation was arbitrary and capricious.

Other language in section 1A, as well as language in other sections of the plan, supports the judgment that Ford's construction was unreasonable. The last clause of section 1A provides that benefits shall not be paid to a person "having less than 10 years of credited service upon normal retirement." This language reinforces the conclusion that under the plan the only conditions of eligibility are being employed for ten years and reaching normal retirement age. Significantly, while this clause prohibits payments if certain conditions are not met, it does not prohibit the payment of retroactive benefits. Article V section 1C, which states that "an active member retiring on or after his normal retirement date shall be eligible for normal retirement benefits," (J.A. tab 1 at F00319), further reinforces the understanding that application is not a condition of eligibility. As will be discussed, Art. VI section 1B also supports the conclusion that Ford's construction of the plan was unreasonable.

Reading the provisions discussed above together, it is fair to say that Ford's plan plainly states that the only conditions of eligibility for benefits are working the required number of years and reaching the necessary age. To interpret the plan as Ford did, to make applying for benefits a condition of eligibility, is inconsistent with the plan's plain language. A construction of a plan that ignores its plain language is unreasonable. *Hess,* 274 F.3d at 461; *Swaback,* 103 F.3d at 540; *Filipowicz,* 56 F.3d at 814.

In assessing the reasonableness of Ford's construction of the plan, I may also consider whether Ford articulated a satisfactory explanation for its interpretation. *Cuddington,* 33 F.3d at 817; *Exbom,* 900 F.2d at 1143. As previously indicated, Ford violated 29 C.F.R. § 2560.503–1(g)(1)(ii) by failing to reference specific plan provisions when it notified plaintiff of its adverse determinations of her appeals. In addition, although Ford communicated to plaintiff that its denial was based on its plan, Ford never explained how it reached the conclusion that the language of the plan supported the denial. In its communications, Ford typically asserted that the plan justified its decision without indicating how this was so. For example, on April 26, 1997, Ford wrote that benefits "are effective the first day of the month following the signed application" (J.A. tab 9), and on July 31, 1997, that "benefits shall not be payable for any periods prior to the date of application." (*Id.* tab 11.) However, in neither of these communications, nor in any others, did Ford articulate a rational connection between the plan language and its denial. Ford's failure to articulate a satisfactory explanation for its interpretation of the plan strengthens the conclusion that its interpretation was unreasonable.

In its briefs in this court, Ford, for the first time, attempts to explain how it concluded that under the plan applying for benefits was a condition of eligibility. Significantly, however, Ford barely mentions Art. VI, section 1A, which, as previously discussed, most directly addresses the issue and does not support its conclusion. Rather, Ford relies on Art. VI section 1B, entitled "Payment of Benefits," which provides:

> The monthly benefit payable from the Retirement Fund under this Section shall become payable to the retired member, if he then shall be living, on his normal retirement date, or, if the following shall be later, then on the first day of the first month after (I) his employment shall have terminated, and (ii) he shall have filed an application for such benefit with the Committee; and shall be payable on the first day of each month thereafter during his lifetime.

(J.A. tab 1 at F00325.)

However, section 1B does not provide a basis for concluding that Ford's construction was reasonable. First, section 1B does not address eligibility at all but rather relates to when benefits become payable. Nevertheless, Ford argues that section 1B effectively makes application a condition of eligibility because, according to Ford, it provides that "benefits will not become payable until the 'later' of employment termination and filing an application." (Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 7.) However, Ford misstates what section 1B actually says. The only language in the section that applies to the present case is the language preceding "or" in the third line; and such language states that normal retirement benefits "shall become payable to the retired member on his normal retirement date." The reason that only the language preceding "or" applies to the present case

is because such language applies to a retiree who was "living on his normal retirement date" (which Pickard was), and because the language following "or" applies only to a retiree whose "employment shall have terminated" "later" than "on his normal retirement date" (which Pickard's did not). Thus, the plain language of section 1B contradicts Ford's interpretation of the section. Section 1B plainly states that benefits were payable to Pickard "on his normal retirement date." Therefore, section 1B reinforces the conclusion that under the plan application is not a condition of eligibility, and that Ford's construction to the contrary was unreasonable. *See Hess,* 274 F.3d at 461 (stating that a construction of a plan that ignores its plain language is unreasonable).

For the reasons stated, Ford's denial of benefits based on its plan was arbitrary and capricious. Pickard became eligible for benefits on March 1, 1975, and when he applied for benefits, he was entitled to the benefits for which he was eligible.

## 2. The Relevant Case Law Also Indicates That Ford's Construction was Unreasonable

The relevant case law supports the conclusion that Ford's construction of its plan was unreasonable. The cases uniformly hold that application requirements in plans are not conditions of eligibility. Although the plan language at issue in the cases differs to varying degrees from the language in Ford's plan, the cases are nevertheless instructive. In *Canseco v. Construction Laborers Pension Trust for S. Cal.,* 93 F.3d 600, 606–07 (9th Cir. 1996), the court held that under the plan language in question the conditions of eligibility were completing fifteen years of service, reaching age sixty-two and working 700 covered hours, and that application was not a condition of eligibility.

Rather, the application requirement in the plan imposed a ministerial duty, and the plan administrator's construction to the contrary was arbitrary and capricious. *Canseco* is relevant to the present case because the court based its decision in substantial part on the fact that under the language of the plan, the application requirement was *in addition to,* and not an element of, the eligibility requirement. The court stated:

> [A]lthough Section 5.01 requires an eligible employee to submit an application to begin receiving benefit payments, it does not require an application as a condition of eligibility. On the contrary, Section 5.01 refers to employees who *already* 'meet [ ] the conditions of eligibility[,] . . . . By referring to eligible employees, Section 5.01 clearly contemplates that an employee will already have satisfied the conditions of eligibility before applying for payments to begin.

*Id.* at 606 (emphasis in original). As previously discussed, the language of Ford's plan similarly contemplates that a retiree will have become "a member eligible" for benefits before he or she "make[s] application to the Committee therefor." (J.A. tab 1 at F00325.)

Further, the effect of the proposed construction of the plan in *Canseco* was to add a condition of eligibility:

> By retroactively denying benefits to a class of workers who have indisputably earned them, the Trustees have, in effect, imposed on those workers an additional requirement of eligibility: the submission of an application for benefits. We reject such an additional requirement as inconsistent with the terms of the CLPT plan, since nothing in the CLPT plan makes an application a prerequisite for eligibility.

93 F.3d at 609. Ford's construction of its plan had a similar effect. Finally, one of

the reasons that the construction in *Canseco* was found to be unreasonable was that the plan contained no "prohibition on the payment of retroactive retirement benefits." *Id.* As discussed, Ford's plan also contains no such prohibition.

Other cases concluding that application requirements in plans did not create conditions of eligibility for benefits include *Cotter v. E. Conference of Teamsters Retirement Plan,* 898 F.2d 424, 428 (4th Cir. 1990); *Baird v. Teamsters Affiliates Pension Plan,* 317 F.Supp.2d 588, 596–98 (W.D.Pa.2004); and *Dudek v. Midwest Operating Eng'rs Pension Trust Fund,* No. 02–C–1079, 2003 WL 22757746 (N.D.Ill. Nov.20, 2003). Both *Baird* and *Dudek* make points that are relevant to the present case. In *Baird,* the defendant argued that application was a condition of eligibility based on plan language similar to that in Article VI section 1B in Ford's plan. The court rejected the argument because the plan's definition of eligibility did not include "the substantive requirement that *eligibility* as opposed to the *payment of benefits* . . . is conditioned upon an application." 317 F.Supp.2d at 596. The same is true of Ford's plan. In *Dudek,* the defendant argued that treating the obligation to apply for benefits as a condition of eligibility served the important purpose of maintaining the financial integrity of the plan. 2003 WL 22757746, at *5. In the present case, Ford does not suggest that its construction of its plan serves any particular purpose or that a determination that application is not a condition of eligibility would affect the plan's financial condition.

Thus, as the foregoing discussion indicates, the relevant case law, as well as the language of Ford's plan, supports the conclusion that Ford's construction of its plan was unreasonable.

## C. Effect of Statutes, Regulations and Federal Common Law

Plaintiff also argues that several provisions of federal law provide her with a right to benefits and that under federal common law she is entitled to a presumption against forfeiture. In the interest of completeness, I will discuss her arguments.

### 1. The Non–Forfeiture Rule

ERISA provides that "each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." 29 U.S.C. § 1053(a). Plaintiff argues that if, as Ford contends, its plan makes application a condition of eligibility, Pickard would forfeit most of his normal retirement benefits, and the application requirement would have to be struck down as violative of § 1053(a). Ford responds that § 1053(a) is inapplicable to Pickard because it did not take effect until after he retired. ERISA was enacted on September 2, 1974, and as of that date federal courts had jurisdiction to grant relief based on it. 29 U.S.C. § 1132. However, for plans in effect on January 1, 1974, such as the 1965 plan at issue here, § 1053(a) applies only to plan years commencing after December 31, 1975. 29 U.S.C. § 1061(b)(2). Further, in *Fremont v. McGraw–Edison Co.,* 606 F.2d 752, 755 (7th Cir.1979), the court held that § 1053(a) "only protects against forfeiture the benefits of those who are in an employee status on January 1, 1976, or thereafter." *Id.* (footnote omitted). It is undisputed that Pickard terminated his employment with Ford prior to January 1, 1976.

Plaintiff argues both that *Fremont* misread the legislative history of § 1053(a), and that the present case is distinguishable from it. In *Fremont* three

former employees sought retirement benefits from a former employer, and the former employer denied their claim on the ground that they had stolen from the company. One of the former employees left the company prior to January 1, 1976, but was not denied benefits until after such date. He argued that § 1053(a) protected his benefits because the denial occurred after January 1, 1976. *Id.* at 753–55. However, the Seventh Circuit rejected the argument, concluding that the statute was not intended to protect former employees. *Id.* at 755. I need not explore plaintiff's critique of *Fremont* because it is the law of this circuit. Moreover, I cannot distinguish the present case from *Fremont* on the ground that Pickard was not involved in wrongdoing because the fact of wrongdoing did not overtly figure into the *Fremont* analysis. Therefore, I must reject plaintiff's argument that § 1053(a) protects Pickard's benefits.

### 2. The Retroactive Payment Rule

The Internal Revenue Code and ERISA contain identical provisions with respect to when retirement plans must commence paying benefits. 26 U.S.C. § 401(a)(14); 29 U.S.C. § 1056. Title 26 C.F.R. § 1.401(a)–14 implements both statutes.[3] It applied to Ford's plan in those plan years beginning after December 31, 1975. *See* § 1.401(a)–14(e) ("This section shall apply to a plan for those plan years which section 411 of the [Internal Revenue] Code applies without regard to section 411(e)(2)."); 26 U.S.C. § 411 (stating that § 411 applies to plan years beginning after December 31, 1975); *see also Baker v. Otis Elevator Co.,* 609 F.2d 686, 691 n. 8 (3d Cir.1979).

Section § 1.401(a)–14 establishes a general rule as to when benefit payments must commence and the retroactive payment rule provides an exception to the general rule. Plaintiff argues that the retroactive payment rule required Ford to pay the benefits Pickard sought. The relevant portions of § 1.401(a)–14 are as follows:

### § 1.401(a)–14 Commencement of benefits under qualified trusts.

(a) *In general.* Under section 401(a)(14), a trust to which section 411 applies (without regard to section 411(e)(2)) is not qualified under section 401 unless the plan of which such trust is a part provides that the payment of benefits under the plan to the participant will begin not later than the 60th day after the close of the plan year in which the latest of the following events occurs—

(1) The attainment by the participant of age 65, or, if earlier, the normal retirement age specified under the plan,

(2) The 10th anniversary of the date on which the participant commenced participation in the plan,

(3) The termination of the participant's service with the employer, or

(4) The date specified in an election made pursuant to paragraph (b)(2) of this section.

Notwithstanding the preceding sentence, a plan may require that a participant file a claim for benefits before payment of benefits will commence

. . . . .

(d) *Retroactive payment rule.* If the amount of the payment required to com-

---

**3.** Title 26 C.F.R. § 1.401(a)–14(d) implements 29 U.S.C. § 1056 pursuant to "Reorganization Plan No. 4 of 1978" § 101 which transfers the authority of the Secretary of Labor to issue regulations relating to § 1056 to the Secretary of the Treasury. (Lewis Supp. Aff. tab A.)

mence on the date determined under this section cannot be ascertained by such date, or it is not possible to make such payment on such date because the plan administrator has been unable to locate the participant after making reasonable efforts to do so, a payment retroactive to such date may be made no later than 60 days after the earliest date on which the amount of such payment can be ascertained under the plan or the date on which the participant is located (whichever is applicable).

■ Applying the above provisions to the facts of the present case, Pickard became sixty-five in 1975 and because his sixty-fifth birthday was the latest of the events identified in § 1.401(a)–14(a)(1), Ford would have had to commence making payments on March 1, 1976 (sixty days after the close of plan year 1975) except for the fact that the plan required participants to file a claim for benefits as the regulation permitted. Having imposed an application requirement, Ford was not obliged to commence payments to Pickard until he filed an application. Thus, the retroactive payment rule has no effect in the present case. It has an effect only when the amount owed to a retiree cannot be ascertained "on the date determined under this section" or if payment cannot be made "on such date" because the participant cannot be located. In the present case, the "date determined under this section" was the date that Pickard applied for benefits and on such date Ford knew both the amount owed to him and his location.

### 3. Federal Common Law Presumption Against Forfeiture

As previously discussed, because Pickard was a Ford retiree rather than an employee on January 1, 1976, § 1053(a) does not protect his benefits. Plaintiff argues, however, that in those ERISA cases in which § 1053(a) is inapplicable, forfeitures of benefits are nevertheless presumed to be unreasonable pursuant to federal common law. In support of this argument, plaintiff relies on *Harcourt Amory v. Boyden Assoc., Inc.* 434 F.Supp. 671, 673 (S.D.N.Y.1976), where the court addressed an alleged forfeiture that occurred after the effective date of ERISA but before the effective date of § 1053(a). The court held that under federal common law, forfeitures of earned retirement benefits were presumed to be unreasonable.[4] The court based its conclusion on the legislative history of ERISA, stating:

> [T]he effective date of the prohibition against forfeiture provisions in pension plans was delayed until January 1, 1976 not because of any Congressional hesitancy concerning the wisdom of the prohibition, but because employers needed

---

4. Pre–ERISA cases also suggest that because of the nature of pension plans, provisions creating forfeitures may be unreasonable. *See Hurd v. Ill. Bell Tel. Co.*, 234 F.2d 942, 946 (7th Cir.1956) (stating that a "pension plan is a unilateral contract which creates a vested right in those employees who accept the offer it contains by continuing in employment for the requisite number of years"); *see also McGrath v. R.I. Ret. Bd.*, 88 F.3d 12, 17 (1st Cir.1996) (stating that "the principle that a pension plan represents an implied-in-fact unilateral contract is fairly well settled"); *Pratt*, 920 F.2d at 661 (quoting *Hurd*); *Hoefel v. Atlas Tack Corp.*, 581 F.2d 1, 4–5 (1st Cir.

1978) (noting that "the promise of a pension constitutes an offer which, upon performance of the required service by the employee, becomes a binding obligation"). Thus, when the employee fully performs by completing the required number of years of service, the "employer has received all the consideration he asked for and all he is entitled to." *Neuffer v. Bakery and Confectionery Workers Int'l Union of Am.*, 307 F.2d 671, 674 (D.C.Cir. 1962) (Burger, J., dissenting). At that point, "[i]t should take the clearest and most unequivocal expression of intent to support a conclusion divesting these vested rights." *Id.*

more time to insure that their funds were adequately financed to comply with the statute's vesting requirements—of which the anti-forfeiture section is a part.

*Amory*, 434 F.Supp. at 673 (citation omitted). In support of her argument that a presumption against forfeiture exists and that it applies to the present case, plaintiff also cites Department of Labor Opinion Letter No. 77–32 (Lewis Supp. Aff. tab B), which states that applying for benefits is a ministerial act and that a failure to timely apply should not be treated as a basis for forfeiture. However, because I have determined that, reasonably construed, Ford's plan did not work a forfeiture, it is not necessary for me to determine whether in a non- § 1053(a) ERISA case there is a federal common law presumption against forfeiture. If such a presumption exists, however, it only strengthens the conclusion that Ford's construction of its plan was unreasonable.

## IV.  BREACH OF FIDUCIARY DUTY CLAIM

In addition to alleging that Ford violated § 1132(a)(1)(B) by wrongfully withholding benefits, plaintiff brought a § 1132(a)(3) claim alleging that Ford breached its fiduciary duty to her and class members by violating various statutes and regulations. Ford contends that the § 1132(a)(3) claim should be dismissed because it essentially recasts the claim for benefits. *See Varity Corp. v. Howe*, 516 U.S. 489, 514–16, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); *Borisch v. Treat All Metals, Inc.*, 21 F.Supp.2d 890, 892–93 (E.D.Wis.1998). In her opening brief, plaintiff argued against dismissal of the § 1132(a)(3) claim. However, in her second and third briefs, she did not discuss the claim, apparently abandoning it. In any case, I agree with Ford that the claim should be dismissed. Section 1132(a)(3) is a catch all provision which is unavailable, where, as here, plaintiff has an adequate remedy under another section of ERISA. *Varity Corp.*, 516 U.S. at 514–16, 116 S.Ct. 1065.

## V.  CONCLUSION

For the reasons stated,

**IT IS ORDERED THAT** with respect to the § 1132(a)(1)(B) claim of plaintiff and class members, plaintiff's motion for summary judgment on the issue of liability is **GRANTED**, and Ford's motion is **DENIED**.

**IT IS FURTHER ORDERED** that with respect to the § 1132(a)(3) claim of plaintiff and class members, plaintiff's motion for summary judgment is **DENIED**, and Ford's motion is **GRANTED**.

**IT IS ORDERED** that a phone conference will be held on **November 18, 2004 at 10:30 a.m.** to schedule further proceedings. The court will initiate the call.